EMAS, J.
Alderwoods Group, Inc., Osiris Holding of Florida, Inc. d/b/a Graceland Memorial Park South, f/k/a/ Paradise Memorial Gardens, Inc., and Northstar Graceland, LLC (collectively “Alderwoods”), former and current owners and operators of Graceland Memorial Park South Cemetery (the “Cemetery”), appeal the lower court’s non-final order granting class certification. For the reasons that follow, we reverse.
I. FACTS
Appellees, Reyvis Garcia, Ramona Johnson, and Mercedes Woodberry (collectively the “Representative Plaintiffs”) have family members buried at the Cemetery. They filed suit against Alderwoods, asserting each of the Representative Plaintiffs sought to locate their relatives’ graves but were unable to do so.
A. Background
The Cemetery opened in 1959 at Southwest 117th Avenue and 139th Street in Miami, Florida, extending east to west from 117th Avenue to the Florida Turnpike. Thousands of people are buried in what is deemed the “old section” of the Cemetery, consisting of approximately seven acres of the nearly thirty-five acre plot of land. The old section contains burials from approximately 1959 until at least 1993, and includes more than 5000 graves.
B. The Comptroller’s Investigation
In mid-1996, the Comptroller of the State of Florida, as head of the Florida Department of Banking and Finance (the “Department”), commenced an investigation of the Cemetery pursuant to the provisions of the Florida Funeral and Cemetery Services Act, Chapter 497, Florida Statutes (1996) (“Cemetery Act”). The Department noted serious deficiencies in the Cemetery’s books and records, determining them to be “unexaminable.” On February 20, 1997, the Department and Osiris Holding Corporation entered into a stipulation and consent order. Under the terms of this order, the Cemetery-in lieu of immediate administrative suspension for its inability to be examined-received a fine and was required to retain certified public accountants to perform an audit. The order further required that, no later than July 31, 1997, the Cemetery would bring its books and records into compliance with the Cemetery Act. The Department subsequently placed the Cemetery on probation pursuant to sections 497.233(l)(a), (i), (j) and (w) of the Cemetery Act.[1]
The Cemetery violated the terms of the stipulation and consent order by failing to bring its books and records into compliance with the Cemetery Act by the agreed-upon deadline. On January 12, 1999, the Department issued a cease and desist order, finding an immediate danger to the public welfare. The Department concluded the Cemetery was “unable to rehabilitate [its] operations,” failed to implement the CPA’s recommendations, and “failed to make corrections to [its] books, records and processes” that would bring it into compliance. As a result, the Department suspended the Cemetery’s license as it pertained to: entering into preneed con *500 tracts; engaging in sales; advertising pre-need services, preneed merchandise and preneed burial rights; entering into pre-construction sales contracts; engaging in preconstruction sales; and advertising and soliciting at-need sales. The Department suspended the Cemetery’s license until such time as the Cemetery came into compliance with the requirements of the Cemetery Act.
The suspension remained in effect until July of 2002, when the Department conducted examinations to determine compliance with the 1999 cease and desist order. The Department issued a report concluding that the majority of the problems it identified during the 2002 examination were inconsistent cemetery records. Thereafter, on December 23, 2002, the Department issued a final order (the “Final Order”) on a new stipulation between the parties executed on the same date, finding “no current and continuing violations, which justify continuing the suspension of preneed sales by [the Cemetery],” but otherwise requiring strict compliance with all provisions of the Cemetery Act. Specifically, the Final Order provided that within sixty days, the Cemetery was obligated to “(1) [reconcile its burial space inventory and burial rights ownership records at Graceland Memorial Park; (2) provide a Reconciliation Report to the Department of its findings and corrections; and (3) provide appropriate notification to any affected customers.” Within twenty-four months from the effective date of the Final Order, the Department would assess the Cemetery’s compliance.
C. Events Giving Rise to the Instant Lawsuit
The events giving rise to the instant lawsuit began shortly after the issuance of the above-described 2002 Final Order. Thereafter, in December 2004, Reyvis Ramon Garcia filed suit against Alderwoods. Following a deposition of the cemetery manager, Yvette McPhillips[2], Garcia added the class action allegations in June 2006 and Ramona Johnson and Mercedes Wood-berry were added as plaintiffs in October 2006. Each of the Representative Plaintiffs was alleged to have a relative buried in the old section of the Cemetery between 1986 and 1993, and each allegedly had difficulty locating the gravesites of their respective family member. The allegations surrounding each of their family members’ gravesites are as follows:
• Reyvis Ramon Garcia’s mother, Eloísa, was buried in the old section on March 20,1986. Garcia arrived from Cuba in 2003 intending to pay respects to his mother’s grave, but her body could not be readily found and the Cemetery was “never able to tell [him] exactly where she was buried.” He admits his family did not purchase a memorial to mark the grave. When Garcia subsequently went to visit the grave of his aunt who was also buried at the Cemetery, her grave was found without issue. However, while he was at the Cemetery, he observed employees inserting metal bars into the ground, a process called “probing,” and was told the Cemetery was attempting to locate his mother’s grave. He became upset with what he saw. After eventually narrowing down the location at which *501 his mother was believed to be buried, Cemetery employees, in the presence of a licensed funeral director, removed the lid of the outer burial container believed to be Eloisa’s and inspected the casket without removing either the casket or remains. The parties confirmed that the remains were those of Eloísa. Garcia is the only Representative Plaintiff who alleges his family member’s interred remains were disturbed in some manner.
• Ramona Johnson’s father, Robert Williams, was buried in the old section of the Cemetery in June 1993 with a temporary marker on his grave. Thereafter, Johnson’s attempts to locate her father’s grave on several occasions were unsuccessful because the temporary marker was missing. The temporary marker was simply a piece of paper in a plastic cover and was only supposed to identify the grave until a tombstone was purchased by the family. No tombstone was ever purchased. Though she went to the cemetery in 2001, 2003 and 2004, Johnson did not make an inquiry about the location of her father’s remains until 2006. At that time, the Cemetery could not locate or identify his grave in its books. Johnson never asked the lower court to order an inspection of the grave believed to be that of her father.
• Mercedes Woodberry’s child, Constance Grace, was stillborn. She was buried in 1989 in a portion of the old section of the Cemetery known as “Ba-byland.” Woodberry never purchased a permanent burial marker. Thereafter, however, Woodberry sought the location of her daughter’s grave to erect a headstone, but the Cemetery was unable to locate Constance’s burial site even after being provided a specific lot number. Beginning in 1995, Woodberry returned to the Cemetery several times, but each time Cemetery employees told her they could not locate her- daughter’s graves-ite. Approximately twelve years later, Woodberry joined the instant suit. In March 2008, in the presence of Wood-berry’s sister and the Cemetery’s funeral director, the Cemetery inspected the grave believed to be that of Constance. Inside were hooks from an infant-style casket, the remains of a female infant, and the clothing in which the baby was buried. The Cemetery thus believed it located the remains of Woodberry’s daughter, but Woodberry still contends it cannot locate her child’s remains.
In their Fourth Amended Complaint, the Representative Plaintiffs assert claims for (i) Tortious Interference with Dead Bodies; (ii) Intentional or Reckless Infliction of Emotional Distress; (iii) Gross Negligence, and (iv) Equitable Injunctive Relief. The crux of the first three claims is that the Representative Plaintiffs suffered — and continue to suffer — emotional harm as a result of the Cemetery’s alleged inability to locate their family members’ gravesites to their satisfaction. The first three counts seek monetary damages. Count IV, on the other hand, seeks injunc-tive relief, to wit:
[A] permanent mandatory injunction that requires Defendants to fund a court supervised program that provides for an Examiner, the establishment of a Blue Ribbon panel of experts to survey, test, monitor and study the cemetery and disturbed remains to ascertain the location of and disposition of the subject remains and to insure their proper identification and perpetual care.
The Representative Plaintiffs also sought class action certification in two re *502 spects: (1) with regard to Counts I — III, the issue of whether Alderwoods properly-maintained its cemetery grounds and record keeping, sufficient to enable ready location of individuals who have been buried there; and (2) stand-alone certification status for the equitable and mandatory in-junctive relief in Count IY. They sought to certify and represent the following class:
All persons with family members buried before 1994 in the “old section” of Graceland Memorial Park South Cemetery, who are unable to readily locate the gravesites of their family members due to inadequate record keeping and identifying markers.
The Representative Plaintiffs moved for class certification on September 17, 2007. They proposed the foregoing class definition and requested certification of their equitable claims under Florida Rules of Civil Procedure 1.220(b)(1) and (b)(2) and certification of their claims for damages under Rule 1.220(b)(3).
Three years elapsed before the trial court heard this motion in February of 2011. Just prior to the hearing, the Representative Plaintiffs modified their class definition as follows:
All persons with burial plots or family members at Graceland Memorial Park South who were buried before 1994, that are unable to readily locate family members due to inadequate recordkeeping and identifying markers.
At the evidentiary hearing, the Representative Plaintiffs called the Cemetery’s manager, Yvette McPhillips, and also proffered as experts a funeral director, civil engineer, landscape architect, and an executive of a Canadian cemetery and funeral home company. These experts opined that the gridding and pinning of the cemetery grounds in the so-called “old section” did not comply with cemetery industry standards. They also stated that the manner in which to determine whether burials cannot be “readily located” is to carry out the “Examiner’s Action Plan,” which would require the Cemetery to engage in a multi-step process involving an individual examination of each grave. Such process would likely involve analyzing the records pertaining to each grave, looking at the physical aspects of the grave, and in certain instances, probing and opening the grave.
The trial court granted the Representative Plaintiffs’ motion and issued its Order Granting Class Certification on May 4, 2011. The Order certifies a class action on the claim for mandatory injunctive relief in Count IV under Rule 1.220(b)(1) and 1.220(b)(2), and “the underlying issue of liability” in Counts I — III, ie., “whether Defendants’ handling of record keeping, pinning, marking and locating gravesites at Graceland was appropriate^]” under Rule 1.220(b)(3). The court appointed Garcia, Johnson and Woodberry as class representatives and certified the following class:
Class definition: All persons with family members buried before 1994 in the “old section” of Graceland Memorial Park South Cemetery, who are unable to readily locate the gravesites of their family members due to inadequate record keeping and identifying markers.
This class definition excludes (1) all persons whose claims have been reduced to judgment as settled on the date this order is executed; and (2) Defendants’ officers, directors, employees or any person related to, affiliated with or employed by the Defendants.
This appeal followed.
II. ANALYSIS:
We review for an abuse of discretion an order granting class certification because the determination that a case *503 meets the requirements of a class action is a factual finding within a trial court’s discretion. Sosa v. Safeway Premium Fin. Co., 73 So.3d 91 (Fla.2011). However, purely legal determinations made in support of a class action certification decision are reviewed de novo. London v. Wal-Mart Stores, Inc., 840 F.3d 1246 (11th Cir.2003).
A. Claim for Permanent Mandatory Injunctive Relief
1. The procedure to be employed for determininy class membership would provide the Representative Plaintiffs with the ultimate in-junctive relief they seek
The unusual facts at issue here, together with the injunctive relief sought by the Representative Plaintiffs, present something of a conundrum. The method sought to be utilized to determine whether a class exists and to identify class members would require Alderwoods — at the outset of the case — to provide the Representative Plaintiffs with the very injunctive relief they seek in Count IV of their complaint.
As prayed for in Count IV, the Representative Plaintiffs seek a permanent mandatory injunction requiring Alderwoods to fund a court-supervised program through which a panel of experts would “survey, test, monitor and study the cemetery and disturbed remains to ascertain the location of and disposition of the subject remains and to insure their proper identification and perpetual care.” This relief, however, is virtually the very process ordered by the trial court to establish and identify members of the class. In response to an interrogatory, one of the Representative Plaintiffs provided the process for identifying members of the class:
Members of the class may be identified by appointing an Examiner to oversee a professional staff to replat and remap the cemetery, audit cemetery records, probe gravesites, conduct disinterments where necessary, review death certificates, and obituaries.
Further, one of the Representative Plaintiffs’ experts testified at the eviden-tiary hearing that the only way to determine whether one can “readily locate” a particular family member is to carry out a remediation plan which would involve laying a grid on the ground, conducting a topographic review, employing ground penetrating radar, and then going through the entire process of matching names with graves.
Thus, in certifying the class as persons with family members in the old section of the cemetery who cannot “readily locate” their family members’ gravesites due to inadequate record keeping and marking, and in ordering implementation of the Examiner’s Action Plan, the trial court in effect directed a verdict in favor of the Representative Plaintiffs as to Count IV. The class members will be identified only after Alderwoods carries out this protracted and costly[3] procedure to determine whether, and the extent to which, graves were not readily loeatable. However, once Alderwoods completes this substantial undertaking, the Representative Plaintiffs are at liberty to abandon their Count IV claim, as they will have already obtained the relief prayed for in that count. Such a course of action would impose a de facto punishment on Alderwoods, before any determination of liability. See So. Bell Tel. & Tel. Co. v. Wilson, 305 So.2d 302, 305 (Fla. 3d DCA 1975) (reversing class certifi *504 cation on claims for damages and an accounting, holding “[i]t is clear that plaintiffs intend to use the accounting prayed for as a basis for a speculative class which they hope to develop. Such a proceeding is not within the intent of RCP 1.220.”); Liggett Group Inc. v. Engle, 853 So.2d 434, 451 (Fla. 3d DCA 2003), rev’d in part on other grounds 945 So.2d 1246 (Fla.2006) (“Florida law requires that a defendant be found liable before any punishment is imposed.”).
Additionally, the very act of requiring Alderwoods to reconcile burial space inventory and records creates a burden-shifting problem, as Alderwoods will essentially be compelled to prove (or at least assist in proving) elements of the Representative Plaintiffs’ claims. See Kartman v. State Farm Mut. Auto. Ins. Co., 634 F.3d 883, 893 (7th Cir.2011)(affirming denial of class certification where “the contemplated injunction would essentially have the effect of shifting the burden to [defendant] to prove elements of the plaintiffs’ claims.”) The Representative Plaintiffs cannot be permitted to employ the trial court’s equitable powers to determine whether a class actually exists and to establish membership in that class, when the process for such a determination grants the ultimate, permanent and mandatory injunctive relief sought by the Representative Plaintiffs.
2. Principles of res judicata bar the claim for injunctive relief.
Alderwoods also contends that the doctrine of res judicata[4] presents a fundamental barrier to the Representative Plaintiffs’ claim for injunctive relief because the subject matter of that claim was previously adjudicated on the merits in a prior administrative action. We agree.
The Supreme Court explained the doctrine of res judicata in Engle v. Liggett Grp., Inc., 945 So.2d 1246, 1259 (Fla.2006):
A judgment on the merits rendered in a former suit between the same parties or their privies, upon the same cause of action, by a court of competent jurisdiction, is conclusive not only as to every matter which was offered and received to sustain or defeat the claim, but as to every other matter which might with propriety have been litigated and determined in that action.
Id. (quoting Fla. Dep’t of Transp. v. Juliano, 801 So.2d 101, 105 (Fla.2001)). When the government brings an action in its parens patriae capacity, res judicata will bar litigation by private individuals seeking to redress acts that were settled in that prior action, even if the private individuals were not formal parties thereto. Young v. Miami Beach Imp. Co., 46 So.2d 26, 30 (Fla.1950) (finding citizens of Miami Beach were bound by a prior judgment enjoining the city from asserting any interest in a parcel of oceanfront property because the “judgment against [the] municipal corporation in a matter of general interest to all its citizens is binding on the latter, although they are not parties to the suit.”); Castro v. Sun Bank of Bal Harbour, 370 So.2d 392, 393 (Fla. 3d DCA 1979) (holding private parties were precluded from relitigating public nuisance and zoning violation claims already settled by the State). “In order to maintain [a parens patriae ] action, the State must articulate an interest apart from the interests of particular private parties, i.e., the State must be more than a nominal party. The State must express a quasi-sovereign *505 interest.”[5] Engle, 945 So.2d at 1260 (citing Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez, 458 U.S. 592, 607, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982)). To the extent, however, that a subsequent claim involves injuries to “purely private interests” — even if those interests arise from facts related to the State’s action — those claims will not be barred. Satsky v. Paramount Commc’ns, Inc., 7 F.3d 1464, 1470 (10th Cir.1993). Thus, litigation by a government agency will not preclude a private party from vindicating wrongs resulting in distinct individual injuries.[6] Id.
In the instant case, the Department brought an administrative action against Osiris, the owner of the Cemetery, in its parens patriae capacity. In doing so, the Department unquestionably sought to protect “the rights or interests common to the public at large and thereby representing the citizenry of the State.” Engle, 945 So.2d at 1260. The Department brought the action pursuant to the Cemetery Act, Chapter 497, Florida Statutes. The chapter includes the following express legislative intent:
(1) The Legislature recognizes that purchasers of preneed burial rights, funeral or burial merchandise or funeral or burial services may suffer serious economic harm if purchase money is not set aside for future use as intended by the purchaser and that the failure to maintain cemetery grounds properly may cause significant emotional stress. Therefore, it is necessary in the interest of the public welfare to regulate preneed sales and cemeteries in this state.
[[Image here]]
(3) The Legislature deems it necessary in the interest of public health and safety to establish minimum qualifications for entry into the professions and occupations of embalming, funeral directing, cremation, direct disposition, and monument sales; to regulate such activities; and to provide for swift and effective discipline for those practitioners who violate the law.
§ 497.002(1), (3), Fla. Stat. (2011) (emphasis added).
The ultimate result of the Department’s action was a Final Order requiring the Cemetery to “reconcile its burial space inventory and burial rights ownership records at Graceland Memorial Park,” to “provide a Reconciliation Report to the Department of its findings and eorree-tionsf,]” and to “provide appropriate notification to any affected consumers.” Within two years from the date of the order, the Department would determine Osiris’s ongoing compliance with the Act, ensure that all deficiencies and violations discovered during previous examinations were corrected, and confirm that Osiris implemented policies and procedures to ensure future compliance with the Act. Furthermore, the Final Order specifically stated that “no future administrative or civil actions ... can be brought for the violations and acts resolved and settled herein.”
It is clear the Department brought that action pursuant to its statutory authority *506 to regulate the cemetery industry and to protect public health and welfare. The action resulted in Osiris having to correct its faulty record keeping and ensure that every gravesite was properly marked and accounted for. Notwithstanding the foregoing, the Representative Plaintiffs in this case seek permanent mandatory injunctive relief that would effectively require Alder-woods to undertake these exact same actions — to correct and reconcile the cemetery records and identify the remains of each gravesite located in the “old section” of the Cemetery. Res judicata bars the Representative Plaintiffs from seeking a permanent mandatory injunction that would redress the same issues litigated in the administrative action.
B. The Remaining Claims Are Not Amenable to Class Action Treatment
The remaining claims of the complaint are: Tortious Interference with Dead Bodies (Count I); Intentional or Reckless Infliction of Emotional Distress (Count II); and Gross Negligence (Count III), each of which seeks monetary damages. The mere fact that a complaint contains such claims does not prohibit class certification when the other claims demonstrate that the predominant relief sought is injunctive or equitable. Freedom Life Ins. Co. of Am. v. Wallant, 891 So.2d 1109 (Fla. 4th DCA 2004); See also Allison v. Citgo Petroleum Corp., 151 F.3d 402 (5th Cir.1998). However, because class certification fails for the mandatory injunctive relief claim (Count IV) and is barred by res judicata, class certification for these remaining claims must fail as well, given that the relief sought is individual money damages.
Further, these remaining claims require highly individualized proof and are not amenable to class treatment. The United States Supreme Court has held that “[c]onsidering whether ‘questions of law or fact common to class members predominate’ begins ... with the elements of the underlying cause of action.” Erica P. John Fund, Inc. v. Halliburton Co., — U.S. -, -, 131 S.Ct. 2179, 2184, 180 L.Ed.2d 24 (2011) (quoting Fed.R.Civ.P. 23(b)(3)).
In the three remaining counts, the Representative Plaintiffs allege they each suffered emotional distress as a result of Alderwoods’ extreme, outrageous, or willful and wanton conduct. In a cause of action for emotional distress, for example, establishing the claim “requires not only actual injury and compensatory damages, but also a showing of proximate causation and proof that the particular plaintiff suffered severe emotional distress.” Liggett Group, Inc., 853 So.2d at 453, rev’d in part on other grounds, 945 So.2d 1246 (Fla.2006). Such issues involve highly individualized determinations which cannot be established through common proof and are therefore not amenable to class treatment. Id.; Engle, 945 So.2d at 1269.
Similarly, tortious interference with a dead body requires proof of the defendant’s unlawful interference with a dead body. See Kirksey v. Jernigan, 45 So.2d 188, 189-90 (Fla.1950); Donigan v. Nevins, 785 So.2d 573, 576 (Fla. 4th DCA 2001). The Representative Plaintiffs cannot establish through common proof that the Cemetery physically interfered with each body in the old section. Even if, for example, removing the lid from the outer burial of Eloísa Garcia is deemed unlawful interference, this in no way establishes that the Cemetery interfered with the remains of the family members of Woodber-ry, Johnson, or any other putative class member.
Finally, a claim for gross negligence requires proof of willful and wanton conduct *507 by Alderwoods, or proof of some physical injury[7]. See Gonzalez v. Metro. Dade Cnty. Pub. Health Trust, 651 So.2d 673, 676 (Fla. 3d DCA 1995). Evidence that Alderwoods was unable to readily locate one specific gravesite in no way establishes that Alderwoods acted willfully or with malicious intent toward the entire putative class. This would have to be established on an individual basis.
In the absence of a certification of the injunctive relief claim, it is evident that the predominant (and perhaps exclusive) relief sought on the remaining claims is for individual damages for emotional distress and mental anguish, defying class treatment. Engle, 945 So.2d at 1269-70; Wallant, 891 So.2d at 1117-1118.
Based on the foregoing, the Representative Plaintiffs cannot establish entitlement to relief based on common proof. There is simply no common evidence that can substitute for the fact-intensive, individualized proof that will be required to establish each plaintiffs claim under each set of unique facts and circumstances.[8]
*508 III. CONCLUSION
For the reasons stated above, we reverse the trial court’s order granting class certification and remand for proceedings consistent with this opinion.

. This section of the Cemetery Act was subsequently repealed. See Ch. 2006-2, § 15, Laws of Fla.

. At her deposition, McPhillips testified that the Cemetery encountered problems locating persons buried in the old section of the cemetery prior to 1994 due to the fact that the Cemetery’s records were unclear, its method of numeration changed with successive owners, and the pins used to identify spaces did not correlate to the records. Thus, the Cemetery had difficulty pinpointing the exact locations where persons were buried and instead could only point to a general area.

. It was alleged during the hearing below that this process would take more than three years to complete, at a cost of more than six million dollars.

. The application of res judicata at the class certification stage is a question of law to be reviewed de novo. Engle v. Liggett Group, Inc., 945 So.2d 1246, 1259 (Fla.2006).

. Although the Supreme Court has not yet expressly defined the term "quasi-sovereign,” it is clear that a state must be "litigating the rights or interests common to the public at large and thereby representing the citizenry of the State.” Engle, 945 So.2d at 1260 (citing Satsky v. Paramount Commc'ns, Inc., 7 F.3d 1464, 1470 (10th Cir.1993)). The "state may not sue to assert the rights of private individuals.” Id.

. Because the Department had no standing to raise or pursue these purely private interests, plaintiffs are not barred from seeking damages, on an individual basis, for the claims alleged in Counts I — III.

. The complaint does not allege physical impact or injury as a part of any of these claims.

. Although we do not reach this issue, we note that there is subjectivity and uncertainty inherent in the class definition in this case. The trial court certified the class as follows:
All persons with family members buried before 1994 in the "old section” of Graceland Memorial Park South Cemetery, who are unable to readily locate the gravesites of their family members due to inadequate record keeping and identifying markers.
Class members must be readily discoverable because they may be bound by a judgment for defendants, despite their lack of participation in or knowledge of the proceeding. Costin v. Hargraves, 283 So.2d 375, 377 (Fla. 1st DCA 1973). Thus, "the class sought to be represented must be adequately defined and clearly ascertainable." DeBremaecker v. Short, 433 F.2d 733, 734 (5th Cir.1970). Elements of defining a particular class include: "(1) specifying a particular group that was harmed during a particular time frame, in a particular location, in a particular way; and (2) facilitating a court’s ability to ascertain its membership in some objective manner.” Foster v. D.B.S. Collection Agency, 2002 WL 484500, at *3 (S.D.Ohio, 2002). Where a "prolonged and individualized analytical struggle" is necessary to establish class membership, class certification is improper. In re Agric. Chem. Antitrust Litig., 1995 WL 787538, at * 2 (N.D.Fla.1995). See also Metcalf v. Edelman, 64 F.R.D. 407, 409 (N.D.Ill.1974)(holding "[a] class must be capable of concise and exact definition”)
Membership in the instant class rests on a series of factual determinations: 1) Is the deceased individual a "family member” of the plaintiff? 2) Can the plaintiff “readily locate” the gravesite of the family member? 3) If the gravesite cannot be readily located, is this due to "inadequate record keeping and identifying markers”? One or more of these inquiries will likely raise additional questions to be answered. As an example: How do we determine whether a gravesite can be "readily located”? Must it be located within a specific number of hours, or days? If an incorrect gravesite location is initially provided but the error is quickly corrected, does that mean that the gravesite was readily located, or does a family member have to be directed to a certain number of incorrect (or unlocatable) gravesites before it can be said the gravesite cannot be readily located?
The various ways in which these questions can conceivably be answered, and the subjective nature of the phrase "readily locate” suggests the class definition is flawed because "the court cannot determine the identity of the members of the class or even the size of the class without inquiring into the facts surrounding” each attempt to readily locate the gravesite. See So. Bell Tel. & Tel. Co. v. Wilson, 305 So.2d 302, 304 (Fla. 3d DCA 1974). Because elements of the proposed class definition "would essentially require a mini-hearing on the merits of each class member’s case," the definition is legally deficient. Sanneman v. Chrysler Corp., 191 F.R.D. 441, 446 (E.D.Pa.2000). See also Crosby v. Social Sec. Admin. of U.S., 796 F.2d 576, 579-580 (1st Cir.1986)(use of phrase “within a reasonable time” as part of class definition fails to satisfy the basic requirements for a class action under Rule 23 of the Federal Rules of Civil Procedure where class members are "impossible to identify prior to indi *508 vidualized fact-finding and litigation!.]”). We recognize, of course, that a class definition may be revised or modified in an effort to cure these infirmities. See e.g., Sonic Auto., Inc. v. Galura, 961 So.2d 961 (Fla. 2d DCA 2007).