# Supreme Court of Florida

_____

No. SC17-1562
_____

**ROLANDO P. RUIZ, etc.,**
Petitioner,

vs.

**TENET HIALEAH HEALTHSYSTEM, INC., et al.,**
Respondents.

December 20, 2018

LABARGA, J.

Petitioner Rolando P. Ruiz seeks review of a decision of the Third District Court of Appeal which affirmed the entry of a directed verdict in favor of Respondent Arturo Lorenzo, M.D. *Ruiz v. Tenet Hialeah Healthsys.*, 224 So. 3d 828 (Fla. 3d DCA 2017).[1] Because we hold the Third District erred in that decision by equating the proximate cause of an injury with the primary cause of an injury, we quash the decision below and remand the case to the Third District.

---

1. We have jurisdiction. *See* art. V, § 3(b)(3), Fla. Const.

## Facts

In 2009, Ruiz's late wife, Maria Elena Espinosa, noticed a large mass had developed on the back of her head. Espinosa sought the advice of her primary care physician, who diagnosed the mass as a tumor and referred Espinosa to a neurosurgeon. The neurosurgeon did not order a biopsy of the tumor, but believed it to be an osteosarcoma. Imaging studies of the tumor showed it had invaded Espinosa's skull and could soon begin to press upon her brain. The neurosurgeon recommended immediate surgery to remove some of the tumor's mass—a process known as "debulking" the tumor—and render it more susceptible to other forms of treatment, such as radiation or chemotherapy.

Espinosa agreed to the surgery, which the neurosurgeon would personally perform with assistance from a colleague. The neurosurgeon asked Espinosa's primary care physician to order a battery of laboratory tests to ensure Espinosa was medically fit to undergo surgery. These tests included an electrocardiogram (EKG) and a urinalysis. The results of these tests were included in Espinosa's chart. The EKG readout in Espinosa's chart was a copy of a copy, and the image quality was correspondingly poor. It did, however, include an automated interpretation by the EKG machine itself which flagged the test result as abnormal, indicating Espinosa's heart may have been enlarged and that she may also have suffered two myocardial infarctions. Espinosa's urinalysis results occupied two

pages of her chart. On the second page, the urinalysis indicated the abnormal presence of protein in Espinosa's urine, a condition known as proteinuria. Despite these abnormal test results, Espinosa's primary care physician cleared her for surgery, which was scheduled to be performed at 8:00 a.m. on May 13, 2009, at Hialeah Hospital.

That morning, Espinosa and Ruiz arrived at Hialeah Hospital around 6:00 a.m. Espinosa was taken to a separate room to be prepared for surgery while Ruiz remained in the waiting area. Dr. Lorenzo, an anesthesiologist, was also present at Hialeah Hospital that morning to assist with a different patient's procedure and was not assigned to Espinosa. Around 8:00 a.m., however, he learned Espinosa's assigned anesthesiologist, Dr. Guillermo Velasquez, was running late and that Espinosa's pre-anesthesia evaluation had not yet been performed. To maintain the pre-operation schedule and put Espinosa at her ease, Dr. Lorenzo decided to perform Espinosa's pre-anesthesia evaluation himself.

Dr. Lorenzo introduced himself to Espinosa and told her, "I am not going to be your anesthesiologist." He then asked Espinosa a series of questions about her medical history and present condition, recording the information she gave him on a "pre-anesthesia form/moderate sedation evaluation form" in Espinosa's chart. Dr. Lorenzo also reviewed some—but not all—of the test results in Espinosa's chart. He reviewed the EKG and, although the readout was blurry, Dr. Lorenzo

later testified he was able to interpret the EKG with sufficient clarity to conclude Espinosa's heart was functioning normally. Dr. Lorenzo believed the abnormal result was caused by a malfunction of the EKG machine and not by any problem with Espinosa's heart. He also reviewed the first page of Espinosa's urinalysis results, but did not look at the second page of those results, where the abnormal proteinuria reading was displayed. During trial, Dr. Lorenzo admitted the proteinuria reading was something he "would want to know," but also stated it would not have affected his determination of whether it was safe for Espinosa to undergo anesthesia.

After Dr. Lorenzo had completed approximately half of the pre-anesthesia form, Dr. Velasquez arrived and took over from Dr. Lorenzo. Dr. Lorenzo then signed the pre-anesthesia form, introduced Dr. Velasquez to Espinosa, and told Dr. Velasquez, "There is nothing, no major medical problems whatsoever. You may want to look at the EKG." Dr. Lorenzo then left the room. Overall, he estimated he saw Espinosa for between three and five minutes, but stated he "wasn't looking at the clock." Dr. Lorenzo did not inform Espinosa's surgeons about the abnormal EKG, which he had reviewed, or about the urinalysis results reflecting abnormal proteinuria, which he had not. Dr. Velasquez later testified that after taking over from Dr. Lorenzo he began the pre-anesthesia evaluation over again from the beginning. Dr. Velasquez reviewed the EKG and the urinalysis

results, including the proteinuria reading, but also did not inform Espinosa's surgeons of these abnormal test results. He also signed the pre-anesthesia form, and cleared Espinosa for surgery.

During the surgery, Espinosa lost a large amount of blood and suffered a precipitous drop in blood pressure, which her physicians were unable to reverse. A little over an hour into the surgery, she went into cardiac arrest and could not be resuscitated. An autopsy was performed, and a pathology test of the tumor tissue revealed that, rather than being an osteosarcoma, Espinosa's tumor was caused by a type of plasma cell cancer known as multiple myeloma.

Ruiz filed a medical malpractice action against each physician involved in Espinosa's treatment, including Dr. Lorenzo. In part, Ruiz alleged Espinosa's death was caused by the failure to correctly diagnose her condition as multiple myeloma. Ruiz argued multiple myeloma should only be treated through radiation or chemotherapy, and that surgery was not appropriate in Espinosa's case. Had Espinosa been correctly diagnosed at any point, Ruiz claimed, the surgery would have been canceled, and Espinosa would have survived. With regard to Dr. Lorenzo, Ruiz alleged he breached the standard of care by (1) not reviewing all the available data in Espinosa's chart, (2) not ordering a second EKG to reconcile the abnormal results of the first EKG, and (3) not reporting the abnormal lab results—some of which he did not review—to Espinosa's surgeons. Ruiz

contended that, had Dr. Lorenzo adhered to the standard of care, either Dr. Lorenzo or the surgeons would have realized Espinosa was suffering from multiple myeloma and the surgery would have been canceled.

The trial court granted a directed verdict in favor of Dr. Lorenzo, holding that, even assuming Dr. Lorenzo was negligent in his care of Espinosa, he did nothing more than place her in a position to be injured by the independent actions of third parties—namely, the surgeons.[2]  The trial court analogized Dr. Lorenzo to "the cab driver who drove [Espinosa] to the hospital."  Ruiz appealed, and the district court affirmed the trial court's ruling, concluding that no competent, substantial evidence in the record would allow a reasonable factfinder to conclude Dr. Lorenzo was the "primary cause" of Espinosa's death.  *Id.* at 830.  This review follows.

**Analysis**

A directed verdict can only be affirmed "where no proper view of the evidence could sustain a verdict in favor of the nonmoving party."  *Friedrich v.*

_____

2.  We note that the trial court granted Dr. Lorenzo's motion for directed verdict on proximate cause grounds and assumed, for the limited purpose of ruling on that motion, that Dr. Lorenzo breached the standard of care.  The issue before the Court is whether, even if the other elements of Ruiz's claim were satisfied, Ruiz failed to present competent, substantial evidence that Dr. Lorenzo proximately caused Espinosa's death.  Accordingly, any issue regarding the scope of Dr. Lorenzo's duty to Espinosa is beyond the scope of our review, and we express no opinion with regard to that issue.

*Fetterman & Assocs., P.A.*, 137 So. 3d 362, 365 (Fla. 2013) (quoting *Owens v. Publix Supermkts., Inc.*, 802 So. 2d 315, 315 (Fla. 2001)); *see also Cox v. St. Joseph's Hosp.*, 71 So. 3d 795, 801 (Fla. 2011) (explaining "a directed verdict is appropriate in cases where the plaintiff has *failed* to provide evidence that the negligent act more likely than not caused the injury"). "The elements of a medical malpractice action are: (1) a duty by the physician, (2) a breach of that duty, and (3) causation." *Saunders v. Dickens*, 151 So. 3d 434, 441 (Fla. 2014). "Florida follows the 'more likely than not' standard in proving causation, i.e., that the negligence 'probably caused' the plaintiff's injury." *Cox*, 71 So. 3d at 799 (quoting *St. Joseph's Hosp. v. Cox*, 14 So. 3d 1124, 1127 (Fla. 2d DCA 2009)). For the limited purposes of Dr. Lorenzo's motion for directed verdict, the trial court assumed Dr. Lorenzo owed Espinosa a duty of care and that he breached that duty. The issue, then, is whether there was competent, substantial evidence in the record which would permit a reasonable factfinder to conclude that Dr. Lorenzo, more likely than not, proximately caused Espinosa's death. This case presents a pure question of law, which we review de novo. *Keck v. Eminisor*, 104 So. 3d 359, 363 (Fla. 2012).

In determining whether a defendant's conduct proximately caused a plaintiff's injury, courts analyze "whether said injury, given actual causation, was a foreseeable consequence of the danger created by the defendant's negligent act or

omission." *Stahl v. Metro. Dade Cty.*, 438 So. 2d 14, 21 (Fla. 3d DCA 1983). Merely furnishing the occasion for a person to be injured by the supervening negligence of a third party is ordinarily not sufficient to establish proximate cause. *Matthews v. Williford*, 318 So. 2d 480, 481 (Fla. 2d DCA 1975). Instead, the injured party must show that the alleged tortfeasor "substantially caused the specific injury that actually occurred." *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 502 (Fla. 1992). A "harm is 'proximate' in a legal sense if prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question." *Id.* at 503. In the absence of "a freakish and improbable chain of events" leading to injury, "the question of foreseeability as it relates to proximate causation generally must be left to the fact-finder to resolve." *Id.* at 503-04; *see also Gooding v. Univ. Hosp. Bldg.*, 445 So. 2d 1015, 1018 (Fla. 1984) (explaining that the defendant's conduct must be "a substantial factor in bringing about" the plaintiff's injury) (quoting Prosser, *Law of Torts* § 41 (4th ed. 1971)).

As evidenced by the above, the law does not require an act to be the exclusive or even the primary cause of an injury in order for that act to be considered the proximate cause of the injury: rather, it need only be a substantial cause of the injury. For example, in *Sardell v. Malanio*, 202 So. 2d 746, 746-47 (Fla. 1967), this Court held that a young boy who threw a football to his friend

could be held to have proximately caused the injuries sustained by a passerby with whom his friend collided as he tried to catch the ball. The district court in *Sardell* had reasoned that Malanio, who threw the ball, "had no 'physical control over the pass catcher' and had no reason to expect the collision with the plaintiff," and therefore "held that the alleged negligence of the catcher effectively isolated the initial alleged negligence of the passer" such that Malanio's act of throwing the football could not be the proximate cause of the plaintiff's injuries. *Id.* at 747 (quoting *Sardell v. Malanio*, 189 So. 2d 393, 394 (Fla. 3d DCA 1966)). On that basis, the district court affirmed the trial court's dismissal of the complaint against Malanio. *Id.*

This Court quashed that decision, explaining that "[t]o preclude liability of the initial negligent actor, the alleged intervening cause must be efficient in the sense that it is independent of and not set in motion by the initial wrong." *Id.* The Court reasoned that the act which injured the plaintiff—that is, the attempt to catch the ball—"was merely a direct, natural and continuous sequel to the initial act of the passer Malanio." *Id.* Indeed, the catcher "would not have acted at all had it not been for the initial act of Malanio, who threw the ball and thereby initiated the series of events which in natural sequence allegedly produced the ultimate injury." *Id.* Thus, although the primary cause of the plaintiff's injury was the collision with

the catcher, Malanio substantially contributed to causing the plaintiff's injury by throwing the football without due care.

The case now before us presents an analogous circumstance: Ruiz argues that Dr. Lorenzo's alleged failure to act with due care allowed Espinosa's surgery to occur. Had Dr. Lorenzo read and reported the abnormal results of Espinosa's pre-operative lab tests, Ruiz alleges, Espinosa's surgery would not have occurred and she would not have died during that surgery. *Cf. Gooding*, 445 So. 2d at 1019 (holding that, in a wrongful death case arising out of alleged medical malpractice, the plaintiff must show the decedent would probably have survived had the care not been negligent). Dr. Lorenzo's conduct was not the primary cause of Espinosa's death, but he may nonetheless be liable for his part in it if his failure to read and report the abnormal test results substantially contributed to causing it.

Our medical malpractice jurisprudence makes clear that a physician may be the *proximate* cause of a patient's injury even if that physician is not the *primary* cause of that injury. In *Saunders*, we held that a treating physician "cannot insulate himself or herself from liability for negligence by presenting a subsequent treating physician who testifies that adequate care by the defendant physician would not have altered the subsequent care." 151 So. 3d at 442. Therefore, we explained, "the issue of whether a treating physician acted in a reasonably prudent manner must be determined for *each* individual physician who is a defendant in a

- 10 -

medical malpractice action." *Id.* This is inconsistent with the notion that only physicians who are the primary cause of a patient's injury may be the proximate cause of that injury. Indeed, our holding in *Saunders* is predicated on the principle that a physician who is not the primary cause of a patient's injury may nonetheless be liable for that injury: otherwise, there would be no reason to analyze the behavior of each physician individually.

By concluding that Dr. Lorenzo was entitled to a directed verdict on causation because he was not the primary cause of Espinosa's death, the Third District entered into conflict with our precedent. The record does not reflect that Espinosa's abnormal lab results caused her death. *See Ruiz*, 224 So. 3d at 830 (noting "the record is devoid of competent, substantial evidence upon which to conclude that the blurry EKG or the abnormal protein level results caused Espinosa's death"). The record does reflect that "the primary cause of Espinosa's death was exsanguination." *Id.* The district court erred, however, when it held that in light of these facts, "[t]he trial court thus correctly granted Dr. Lorenzo's motion for directed verdict." *Id.* Our precedent makes clear that Dr. Lorenzo cannot prevent Ruiz from establishing proximate cause merely by showing his actions or omissions were not the primary cause of Espinosa's death. Instead, to foreclose liability on the grounds of causation, Dr. Lorenzo's acts or omissions must not have substantially contributed to Espinosa's death as part of a natural and

- 11 -

continuous sequence of events which brought about that result. *See McCain*, 593 So. 2d at 502-03; *Gooding*, 445 So. 2d at 1018. To obtain a directed verdict on this basis, Dr. Lorenzo must show there is no competent, substantial evidence in the record which would permit a reasonable factfinder to reach such a conclusion at all. *See Friedrich*, 137 So. 3d at 365; *Cox*, 71 So. 3d at 801.

Accordingly, because the decision below is inconsistent with our precedent regarding the proximate causation standard, we quash *Ruiz* and remand to the Third District for further proceedings consistent with this opinion.

It is so ordered.

PARIENTE, LEWIS, and QUINCE, JJ., concur.
POLSTON, J., dissents with an opinion, in which CANADY, C.J., and LAWSON, J., concur.

ANY MOTION FOR REHEARING OR CLARIFICATION MUST BE FILED ON OR BEFORE DECEMBER 27, 2018. A RESPONSE TO THE MOTION FOR REHEARING/CLARIFICATION MAY BE FILED ON OR BEFORE JANUARY 2, 2019. NOT FINAL UNTIL THIS TIME PERIOD EXPIRES TO FILE A REHEARING/CLARIFICATION MOTION AND, IF FILED, DETERMINED.

POLSTON, J., dissenting.

Because the Third District's decision in *Ruiz v. Tenet Hialeah Healthsystem, Inc.*, 224 So. 3d 828 (Fla. 3d DCA 2017), does not expressly and directly conflict with the decisions alleged by the Petitioner during jurisdictional briefing, this Court does not have the constitutional authority to review this case. Accordingly, I respectfully dissent.

- 12 -

For example, *Ruiz* does not conflict with *Cox v. St. Josephs Hospital*, 71 So. 3d 795 (Fla. 2011), or *Friedrich v. Fetterman & Assocs., P.A.*, 137 So. 3d 362 (Fla. 2013). In *Cox*, this Court concluded "that the district court impermissibly reweighed the evidence and substituted its own evaluation of the evidence in place of the jury." 71 So. 3d at 800. At trial, conflicting evidence was presented, and the jury entered a verdict in favor of Cox, which was reversed on appeal by the Second District. *Id.* at 801. When quashing the Second District, this Court in *Cox* explained that "the jury was presented with conflicting testimony[,] . . . which is a matter for the jury, not a matter for the appellate court to resolve as a matter of law." *Id.* Similarly, in *Friedrich*, this Court held that the Fourth District impermissibly reweighed conflicting expert testimony and "substituted its own evaluation of the evidence in place of that of the jury." 137 So. 3d at 366. In contrast, in *Ruiz* the Third District explained that "[n]one of the expert witnesses testified that Dr. Lorenzo's evaluation of Espinosa fell below the standard of care such that any breach more likely than not caused Espinosa's death." 224 So. 3d at 830. "In addition, the record is devoid of competent, substantial evidence upon which to conclude that the blurry EKG or the abnormal protein level results caused Espinosa's death." *Id.* In other words, there was no evidence in support of Ruiz's argument. Therefore, because in *Ruiz* (unlike in *Cox* and *Friedrich*), there was no evidence to reweigh, there is no conflict.

Moreover, there is no conflict with *Saunders v. Dickens*, 151 So. 3d 434 (Fla. 2014). In *Saunders*, this Court addressed statements made by Dr. Dickens' counsel that "because [the subsequent physician] would not have done anything differently had Dr. Dickens ordered a cervical MRI, any purported negligence by Dr. Dickens could not be the cause of Saunders's injuries." *Id.* at 442. This Court held that the statements were improper and that "testimony that a subsequent treating physician would not have treated the patient plaintiff differently had the defendant physician acted within the applicable standard of care is irrelevant and inadmissible and will not insulate a defendant physician from liability for his or her own negligence." *Id.* at 443. However, in *Ruiz*, the Third District did not address an argument that subsequent physicians would not have done anything differently. Therefore, because the legal issues are different, there is no conflict between *Ruiz* and *Saunders*.

There is also no conflict with *Owens v. Publix Supermarkets, Inc.*, 802 So. 2d 315 (Fla. 2001). In *Owens*, this Court reviewed the entry of a directed verdict in a slip and fall case and whether the appearance of the hazardous condition, when there was no evidence as to how long the hazard had been on the floor, was enough to constitute constructive knowledge. 802 So. 2d at 329. This Court held that "the condition of the banana raised a basis for establishing the store's constructive knowledge," precluding a directed verdict. *Id.* at 332. In *Ruiz*, the issue was

- 14 -

whether there was competent, substantial evidence for a jury to find that Dr. Lorenzo's alleged negligence caused Espinosa's death. 224 So. 3d at 830. Therefore, because *Ruiz* (unlike *Owens*) did not address the issue of constructive knowledge in slip and fall cases, there is no conflict.

Additionally, there is no conflict with *Gooding v. University Hospital Building, Inc.* 445 So. 2d 1015 (Fla. 1984). In *Gooding*, this Court set forth the following "more likely than not standard:"

> The plaintiff must show that the injury more likely than not resulted from the defendant's negligence in order to establish a jury question on proximate cause. In other words, the plaintiff must show that what was done or failed to be done probably would have affected the outcome.

445 So. 2d at 1020. Because the plaintiff in *Gooding* failed to satisfy this test, this Court held that the hospital's motion for a directed verdict should have been granted. *Id.* More specifically, this Court in *Gooding* concluded that "the testimony established a no better than even chance for Mr. Gooding to survive, even had there been an immediate diagnosis of the aneurysm and emergency surgery[; t]herefore, a jury could not reasonably find that but for the negligent failure to properly diagnose and treat Mr. Gooding he would not have died." *Id.* at 1018. Similar to *Gooding*, the Third District in *Ruiz* applied the "more likely than not standard" and concluded "[t]here is no competent, substantial evidence at trial from which a jury could reasonably conclude that Dr. Lorenzo's behavior fell

below the standard of care, or that any breach of the standard of care more likely than not caused Espinosa's death." *Ruiz*, 224 So. 3d at 830. Therefore, because both *Gooding* and *Ruiz* applied the "more likely than not standard" and reached similar results, there is no conflict between the two cases.

Accordingly, because the cases alleged by the Petitioner do not conflict with *Ruiz*, this Court lacks jurisdiction to review this case. I respectfully dissent.

CANADY, C.J., and LAWSON, J., concur.

Application for Review of the Decision of the District Court of Appeal – Direct Conflict of Decisions

Third District - Case No. 3D15-2474

(Miami-Dade County)

Jorge P. Gutierrez, Jr., of The Gutierrez Firm, Coral Gables, Florida; and Philip D. Parrish of Philip D. Parrish, P.A., Miami, Florida,

for Petitioner

Mark Hicks, Dinah Stein, Amanda Forti, and Erik P. Bartenhagen of Hicks, Porter, Ebenfeld & Stein, P.A., Miami, Florida; and Jonathon P. Lynn of Chimpoulis, Hunter & Lynn, P.A., Plantation, Florida,

for Respondents

Daniel B. Rogers of Shook, Hardy & Bacon, LLP, Miami, Florida,

for Amici Curiae American Medical Association and Florida Medical Association