[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-11283

_____

D.C. Docket No. 6:18-cv-00515-CEM-GJK

ANGEL COLON,
NORMAN E. CASIANO-MOJICA,
FRANCHESSKA MERCADO,
JEANETTE MCCOY,
CESAR RODRIGUEZ,
COREY RIVERA,
ROSAMARIA FEBO,
DAVID JOURDENAIS,
EMILY ANN PORTALATIN,
RODNEY SUMTER,
ADRIAN LOPEZ,
JAVIER NAVA,
LEONEL MELENDEZ,
JOAQUIN ROJAS,
KALIESHA ANDINO,
CARLOS MUNIZ,
JUAN J. CUFINO-RODRIGUEZ,
IVAN DOMINGUEZ,
individually and on behalf of the estate of Eric Ivan Ortiz Rivera,
CASSANDRA MARQUEZ,
GEOFFREY RODRIGUEZ,
DONALD BROWN,
individually and on behalf of the estate of Antonio Brown,
JOSE DIAZ,
JAMMY VALENTIN FERNANDEZ,

individually and on behalf of the estate of Leroy Valentin Fernandez,
CARLOS J. PEREZ ANGLERO,
DEMETRIUS POLANCO,
MIGUEL VEGA,
CARMEN N. CAPO-QUINONES,
individually and on behalf of the estate of Luis Omar Ocasio-Capo,
CORY RICHARDS,
JONATHAN L. GARCIA,
OLGA MARIA DISLA,
individually and on behalf of the estate of Anthony Luis Laureano Disla,
NATHAN OROZCO,
BETTIE LINDSEY,
NEREDIA RIBOT,
YVENS CARRENARD,
SONIA N. CEDENO,
KADIM RAMOS,
MERCEDES GARCIA,
SANDY ROBERTS,
MERCEDES A. MCQUERY,
JAVIER ANTONETTI,
KEINON CARTER,
MARISSA DELGADO,
MAVELYN MERCED,
JUAN ANTONETTI,
ROLANDO J. RODRIGUEZ,
CHRISTIAN ORIZ-CARDONA,
YORVIS JOSE CAMARGO-ROMERO,
JOSEPH NEGRON,
CHRISTOPHER HANSEN,
NELSON RODRIGUEZ,
ROBERTO TEXIDOR-CARRASQUILLO,
CHRISS MICHAEL WEST,
JACOBI CEBALLO,
MICHAEL GONZALEZ,
 MARITZA GOMEZ,
MOHAMMED S. ISLAM,
FRANCISCO G. PABON GARCIA,
BERNICE DEJESUS VALAZQUEZ,
individually and on behalf of the estate of Franky Jimmy DeJesus Valazques,
ISMAIL MEDINA MORALES,

individually and on behalf of the estate of Angel Candelario Padro,
EDWIN RIVERA ALVAREZ,
JOSE PACHECO,
LIZMARYEE FINOL VILORIA,

                                                    Plaintiffs - Appellants,

versus

TWITTER, INC.,
GOOGLE, LLC,
FACEBOOK, INC.,

                                                    Defendants - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(September 27, 2021)

Before JORDAN, BRASHER, and JULIE CARNES, Circuit Judges.

JORDAN, Circuit Judge:

    In the early morning hours of June 12, 2016, Omar Mateen entered Pulse, an LGBT nightclub in Orlando, Florida.  He was armed with a SIG-Sauer MCX semi-automatic rifle and a 9mm Glock semi-automatic pistol.  Unleashing a hail of gunfire, he murdered 49 people and injured 53 others.  He then barricaded himself in a bathroom, called 911, and—referring to himself as an "Islamic soldier"—declared allegiance to The Islamic State of Iraq and Syria (ISIS), a designated foreign terrorist organization (FTO).

3

Following a stand-off, police shot and killed Mr. Mateen. ISIS later claimed responsibility for the mass shooting, which at the time was the deadliest massacre in the United States by a single gunman.[1]

The estates of the some of the murder victims, along with some of the injured, filed a lawsuit in federal court in Michigan against several social media companies—Facebook, Twitter, and Google (YouTube). That action proved unsuccessful. *See Crosby v. Twitter, Inc.*, 303 F. Supp. 3d 564 (E.D. Mich. 2018), *aff'd*, *Crosby v. Twitter*, 921 F.3d 617 (6th Cir. 2018).

A second action—the present case—was filed in federal court in Florida against the same social media companies by different victims of the Pulse shooting. The plaintiffs here alleged in part that the companies aided and abetted Mr. Mateen in violation of the Anti-Terrorism Act, 18 U.S.C. §§ 2333(a) & (d)(2), by facilitating his access to radical jihadist and ISIS-sponsored content in the months and years leading up to the shooting. The plaintiffs also asserted claims against the companies under Florida law for negligent infliction of emotional distress and wrongful death. On the companies' motions, the district court dismissed the ATA and state-law claims with prejudice under Rule 12(b)(6), and the plaintiffs appealed.

---

[1] Sadly, the 2017 Las Vegas massacre, in which 60 people were killed, eclipsed the Pulse shooting a little more than a year later.

Following oral argument, we affirm. We are deeply saddened by the deaths and injuries caused by Mr. Mateen's rampage, but we agree with the district court that the plaintiffs failed to make out a plausible claim that the Pulse massacre was an act of "international terrorism" as that term is defined in the ATA. And without such an act of "international terrorism," the social media companies—no matter what we may think of their alleged conduct—cannot be liable for aiding and abetting under the ATA. As for the state-law claims, the plaintiffs have failed to adequately brief proximate cause under Florida law, and have therefore abandoned their challenge to the district court's ruling.

**I**

Our review of the district court's dismissal order is plenary. In conducting that review we accept the factual allegations in the complaint as true and draw all reasonable inferences in the plaintiffs' favor. *See Williamson v. Travelport, LP*, 953 F.3d 1278, 1284 n.1 (11th Cir. 2020). The question is whether the plaintiffs have pled facts sufficient to make their claims "substantive[ly] plausibl[e]." *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014).

The plaintiffs have only appealed the dismissal of their ATA aiding and abetting claims and their Florida-law tort claims, so we confine our discussion accordingly. In the sections which follow, we set out the legal framework for

5

those claims and then address the relevant allegations of the complaint.  We begin with the ATA aiding-and-abetting claim and then turn to the Florida-law claims.

## II

The ATA provides that any "national of the United States injured in his or her person . . . by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees."  18 U.S.C. § 2333(a).  In an action under § 2333(a) "for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization [FTO] under [8 U.S.C. § 2119], . . . liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance[.]"  § 2333(d)(2).  Aiding and abetting liability under the ATA, therefore, requires an act of "international terrorism" that is "committed, planned, or authorized" by a foreign terrorist organization (FTO).

The term "international terrorism" has a three-part definition under the ATA. It "means activities that . . . (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State; (B) appear intended . . . (i) to intimidate or coerce a

6

civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; *and* (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear to be intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum[.]" § 2331(1)(A)-(C) (emphasis added).

Before turning to the allegations in the plaintiffs' complaint, we pause to recognize that the term "international terrorism" can mean different things at different times to different people. As one journalist put it, "[w]hile most people can agree that terrorism exists, few can agree on what it is." Brian Whitaker, "The Definition of Terrorism," *The Guardian* (May 7, 2001). *Accord United States v. Yousef*, 327 F.3d 56, 107 n.42 (2d Cir. 2003) (explaining that terrorism can be defined according to the "perpetrators' motives, methods, targets, and victims"). Indeed, Congress has defined the term "international terrorism" differently throughout the U.S. Code. *See, e.g.,* 22 U.S.C. § 2656f(d)(1); 22 U.S.C. 2708(k)(1); 34 U.S.C. § 20144(j)(1); 50 U.S.C. § 1701 Note (Iran and Libya Sanctions Act of 1996, Pub. L. 104-172, 110 Stat. 1541, § 14(1)); 50 U.S.C. § 1801(c). In some instances, Congress has linked (or limited) the term to certain specific acts. *See* 22 U.S.C. § 262d(a)(2) (hijacking of aircraft). And in others,

Congress has seemingly left the term undefined. *See, e.g.,* 22 U.S.C. § 2371 (delegating to the Secretary of State the responsibility for determining whether foreign governments have provided support for acts of international terrorism but leaving the term itself undefined); 42 U.S.C. § 2158(b)(3)(B) (delegating to the President the authority to determine whether a foreign government has provided adequate assurance that it will cease support for "acts of international terrorism" but leaving the term undefined).

Here, because the ATA includes a definition of "international terrorism," that definition is the one that matters and our opinion is necessarily limited to the ATA: "When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning." *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000). *See also Western Union Telegraph Co. v. Lenroot*, 323 U.S. 490, 502 (1945) ("statutory definitions of terms . . . prevail over colloquial meanings"). We affirm the district court's dismissal of the ATA aiding-and-abetting claims because the plaintiffs have not sufficiently alleged that the Pulse massacre "transcended national boundaries" as required by § 2333(1)(C), the last part of the ATA definition of "international terrorism."

## A

The district court dismissed the ATA aiding and abetting claims against the social media companies in part because the Pulse massacre was not an act of

"international terrorism" within the meaning of the ATA. Although the complaint is long (149 pages) and detailed (730 paragraphs), we focus on the allegations relevant to this issue as guided by the narrative in the plaintiffs' brief.

Since 2004, ISIS—which uses violent acts such as summary executions, mass beheadings, amputations, crucifixions, rapes, and enslavement against "unbelievers," "combatants," or "prisoners of war"—has been a designated FTO pursuant to 8 U.S.C. § 1189. *See* D.E. 81 at ¶¶ 350-54. The "stated goal" of ISIS is to use social media (including the platforms, services, computers, and communications equipment of the companies named as defendants here) "to assist in carrying out [its] terrorist attacks throughout the world." *Id.* at ¶ 416.

To that end, ISIS reaches potential recruits "by maintaining accounts on Twitter, Facebook, and YouTube so that individuals across the globe may reach out to them directly." *Id.* at ¶ 227. Without Twitter, Facebook, and YouTube, the "explosive growth of ISIS over the last few years into the most feared terrorist group in the world would not have been possible." *Id.* at ¶ 13. Using the sites of these social media companies, ISIS has been able to exert an "outsized impact on how the world perceives it, by disseminating images of graphic violence (including the beheading of Western journalists and aid workers) . . . while using social media to attract new recruits and inspire lone actor attacks." *Id.* (internal quotation marks omitted). According to former FBI Director James Comey, ISIS has "perfected its

use" of Twitter, Facebook, and YouTube "to inspire small-scale individual attacks, 'to crowdsource terrorism,' and to 'sell murder.'" *Id. See also id.* at ¶¶ 281-409 (detailing allegations concerning the use of Twitter, Facebook, and YouTube by ISIS).

Through its use of these sites, ISIS has recruited more than 30,000 foreigners since 2013, including 4,500 Westerners and 250 Americans. *See id.* at ¶ 236. ISIS also solicits and receives donations from these sites. *See id.* at ¶¶ 238-39. Twitter, Facebook, and YouTube allow ISIS to post videos—including violent ones—on their sites and place advertisements on those videos. All of the companies earn revenue from these advertisements and share the proceeds with ISIS, which posted the videos on which the advertisements appeared. *See id.* at ¶¶ 242-43, 591-624. A major component of the Pulse attack was the messaging disseminated by ISIS prior to, during, and after the event, in which ISIS stated its "reasons for committing the" attack. *See id.* at ¶ 412.

Mr. Mateen, a private security guard who lived in Ft. Pierce, Florida, found ISIS content and was radicalized through ISIS' use of Twitter, Facebook, and YouTube. *See id.* at ¶ 676. FBI analysts concluded that he was "self-radicalized on the Internet over a period of several years and decided recently before the [Pulse] attack to embrace [ISIS]." *Id.* at ¶ 426. *See also id.* at ¶ 469. Before and

10

during the Pulse massacre, Mr. Mateen posted messages to Facebook stating that "in the next few days you will see attacks from [ISIS] in the USA." *Id.* at ¶ 459.

Armed with a semi-automatic rifle and a semi-automatic pistol, Mr. Mateen entered the Pulse nightclub in the early morning hours of June 12, 2016, and opened fire. After killing and wounding over 100 persons at Pulse, Mr. Mateen took hostages at the nightclub and barricaded himself. In a call to a 911 operator, Mr. Mateen pledged allegiance to ISIS and declared himself an "Islamic soldier." *Id.* at ¶¶ 457-58. Following a standoff, police shot and killed Mr. Mateen.

Shortly after the Pulse massacre, ISIS issued a statement describing Mr. Mateen as an "Islamic State fighter" and "claiming direct responsibility" for the attack. ISIS' official news agency and official radio station also stated that Mr. Mateen was an "Islamic State fighter" and a "soldier of the Caliphate." *Id.* at ¶¶ 467-68. The news agency "issued a bulletin quoting 'a source' confirming that Mr. Mateen was acting on [ISIS'] behalf." *Id.* at 473. Even if Mr. Mateen was never in contact with ISIS, the organization's use of social media "directly influenced his actions on the night of the [Pulse] massacre." *Id.* at ¶ 478.

## B

The ATA imposes civil liability on "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed . . . an act of international terrorism," provided that the "act of

11

international terrorism" is "committed, planned, or authorized" by a designated "foreign terrorist organization."   18 U.S.C. § 2333(d)(2).   The plaintiffs must therefore plausibly allege that the Pulse massacre was an act of "international terrorism" (as that term is defined in the ATA) *and* that it was committed, planned, or authorized by ISIS.  The district court ruled that the Pulse massacre was not an act of "international terrorism." It did not reach the question whether the attack was committed, planned, or authorized by ISIS, but the social media companies press that argument as an alternative ground for affirmance. *See* Appellees' Br. at 22-27.

**1**

As indicated, the ATA defines "international terrorism" as "activities that . . . (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State; (B) appear to be intended . . . (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; *and* (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear to be intended to intimidate or coerce, or the

locale in which their perpetrators operate or seek asylum[.]"  § 2331(1)(A)-(C) (emphasis added).

All of these requirements must be satisfied "for an act to constitute international terrorism." *Weiss v. Nat'l Westminster Bank PLC*, 381 F.Supp.3d 223, 229 (E.D.N.Y. 2019) (citing *Linde v. Arab Bank PLC*, 882 F.3d 314, 326 (2d Cir. 2018)). *See also Gonzalez v. Google LLC*, 2 F.4th 871, 900 (9th Cir. 2021) ("To qualify as international terrorism, the . . . acts must satisfy each of the criteria contained in § 2331(1)[.]").  With respect to the third part of the ATA's conjunctive definition, i.e. § 2333(1)(C), we agree with the district court that the plaintiffs' allegations do not make out a plausible claim of "international terrorism." The Pulse nightclub shooting did not "occur primarily outside the territorial jurisdiction of the United States."  Nor did it "transcend national boundaries."

First, the Pulse massacre took place in Orlando, Florida.  That is where the Pulse nightclub was located and where Mr. Mateen—a Florida resident—killed and wounded scores of innocent persons.  Even if we were to assume that ISIS had some role in the attack, it is not plausible to conclude from the allegations in the complaint that the massacre was an "activit[y] that "occur[ed] primarily outside the

13

territorial jurisdiction of the United States." *See* Webster's Third New Int'l Dictionary 1800 (2012) (defining "primarily" as "fundamentally, principally").[2]

Second, we are not persuaded by the plaintiffs' argument that the complaint plausibly alleges that the Pulse massacre was an "activit[y]" that "transcend[s] national boundaries in terms of the means by which [it was] accomplished, the persons [it] appear[s] to be intended to intimidate or coerce, or the locale in which the perpetrators operate or seek asylum." The transcending of national boundaries is not a phrase existing in a statutory vacuum. It is linked to three things, none of which is plausibly alleged here.

We start with the "means" by which the activity in question was "accomplished." The word "means" is "a course of action, or an instrument by which an act can be accomplished or an end achieved." The American Heritage Dictionary of the English Language 1086 (4th ed. 2009). The word "accomplish" is to "succeed in doing; bring to pass." *Id.* at 14. The common understanding of both words cuts against the plaintiffs' theory. Mr. Mateen was self-radicalized on the Internet while living in Florida and came to identify with ISIS. He then used firearms to commit mass murder and mayhem in that same state. His deadly acts of domestic terrorism—and the means by which he accomplished them—do not plausibly transcend national boundaries. *See Crosby*, 303 F.Supp.3d at 572.

---

[2] Nothing in the complaint alleges (much less plausibly alleges) that ISIS had any contacts with Mr. Mateen or was aware of his planned attack before it took place.

The plaintiffs argue that a stated goal of ISIS—a designated FTO—is to use social media to radicalize individuals to conduct attacks throughout the world, including in the United States, as part of a campaign of terror, coercion, and intimidation. Mr. Mateen was radicalized by ISIS through the Internet, and ISIS claimed responsibility after the fact for the Pulse massacre. Because ISIS' use of social media allegedly contributed to the Pulse attack, the plaintiffs allege that the attack was "an act of international terrorism." D.E. 81 at ¶ 675. *See also id.* at ¶ 679 (alleging that ISIS uses the social media companies' platforms from outside the United States "in a manner that transcends national boundaries").

These allegations are insufficient to make the "international terrorism" claim plausible. As the social media companies correctly point out, the Internet was not the means by which the Pulse massacre was accomplished. *See* Appellees' Br. at 21. The allegation that ISIS posts propaganda, videos, and messages on the social media companies' platforms—which we accept as true—suggests "nothing more than that ISIS posts information on the Internet, which might be communicated over international borders. Nothing in those statements points to any element of [Mr.] Mateen's conduct in carrying out the attack that had any transnational component." *Crosby*, 303 F. Supp. 3d at 572-73. The same goes for the allegations that the companies derive revenue from advertisements posted on ISIS videos.

15

Again, Mr. Mateen was self-radicalized while living in Florida and committed mass murder there.  A case involving a foreign terrorist who is radicalized overseas, plans his attack there, and then travels to the United States (or elsewhere) to commit an act of mass destruction may well fit the § 2332(1)(C) bill.  *Cf.* 18 U.S.C. § 2332b(g)(1) (criminal provision prohibiting certain terrorist acts transcending national boundaries: "As used in this section . . . the term 'conduct transcending national boundaries' means conduct occurring outside of the United States in addition to the conduct occurring in the United States.").  But this case, given the allegations in the complaint, is not close to that hypothetical.

The Pulse shooting likewise did not transcend national boundaries in terms of the persons it was "intended to intimidate or coerce."  The plausible inference from the plaintiffs' allegations is that a mass shooting on United States soil is meant to terrorize American citizens and residents.  To come to the contrary conclusion we would have to say (or infer) that any act of domestic terrorism, anywhere in the world, is meant to intimidate or coerce all of humankind.  *See Crosby*, 303 F. Supp. 3d at 572.  And if that were the case, we doubt that Congress would have included this limiting language in the ATA.

Finally, because Mr. Mateen was the lone shooter in the Pulse massacre, the complaint does not plausibly allege that his attack transcends national boundaries in terms of the locales in which the perpetrator "operate[d] or seeks asylum."  Mr.

16

Mateen lived in Florida and carried out his murderous spree in that same state, and there is no indication that he sought asylum anywhere else in the world.

The Fifth Circuit recently came to the same conclusion in an ATA case with similar facts.  In *Retana v. Twitter*, 1 F.4th 378 (5th Cir. 2021), which involved a mass shooting in Dallas, Texas, the plaintiffs had alleged that several social media companies provided material support to Hamas, an FTO, by allowing it to use their platforms to "contact potential recruits and encourage them to commit terrorist acts."  *Id.* at 380.  Affirming the dismissal of the plaintiffs' ATA claims, the Fifth Circuit held that the Dallas shooting did not "transcend[ ] national boundaries" because it was "committed by a lone shooter entirely within the United States."  *Id*. at 381.  Though the shooter in *Retana* "might have been radicalized in part by Hamas, . . . Hamas did not plan the shooting or even take credit for it."  *Id*.

We acknowledge that the allegations in this case get the plaintiffs slightly closer, as ISIS did take credit afterwards for the Pulse shooting when Mr. Mateen (whom the plaintiffs admit was self-radicalized) publicly pledged fealty to the organization.  But the reality remains the same: "[ISIS] did not commit the [Pulse] shooting; [Mr. Mateen] did."  *Id*. at 382.  The Pulse massacre "did not 'occur primarily outside' the United States or 'transcend national boundaries,' so it was not an 'act of international terrorism.'"  *Id*. (citing § 2331(1)(C)).  Moreover, the "facts as alleged show that ISIS took credit *after* the attack."  *Copeland v. Twitter,*

17

*Inc.*, 352 F. Supp. 3d 965, 975 (N.D. Cal. 2018).  Without any allegations that ISIS had contact with Mr. Mateen or was aware of the Pulse attack before it took place, its after-the-fact assertion of responsibility is insufficient to make out a plausible contention that the massacre transcended national boundaries "in terms of the means" by which it was "accomplished."  § 2331(1)(C).

**2**

For aiding and abetting liability to attach under the ATA, the act of "international terrorism" must have been "committed, planned, or authorized" by a designated FTO.  *See* § 2333(d)(2).  The plaintiffs' aiding and abetting claim against the social media companies fails on this element as well.

ISIS, as the plaintiffs point out, is indeed a designated FTO.  But we do not view the complaint as plausibly pleading that ISIS "committed, planned, or authorized" the Pulse massacre.  Each of these verbs generally connotes conscious actions at the time of or before an act.  *See* American Heritage Dictionary at 121, 371-72, 1341; Webster's Third New Int'l Dictionary at 145, 457, 1730.  Here ISIS claimed credit after-the-fact, and there is nothing in the complaint to suggest that ISIS was aware of Mr. Mateen or knew beforehand about his planned attack at Pulse.  Although the complaint alleges that "ISIS reaches potential recruits by maintaining accounts on Twitter, Facebook, and YouTube so that individuals across the globe may reach out to [it] directly," D.E. 81 at ¶ 227, the plaintiffs

18

never once claim that Mr. Mateen was in contact with ISIS prior to the shooting, or that ISIS was involved in committing, planning or authorizing the attack, or that ISIS knew about the attack beforehand.

We therefore agree with the Sixth Circuit's resolution of the same issue in the earlier ATA lawsuit arising from the Pulse massacre:

> [Mr.] Mateen by himself and without ISIS' help planned and committed the Orlando attack. [He] was "self radicalized" and never had any contact with ISIS. Nor did ISIS give official permission for (or 'authorize') the attack. Instead ISIS only learned about and approved of the shooting *after* the attack. . . . Without more, there are insufficient facts to [plausibly] allege that ISIS "committed, planned, or authorized" the Pulse [nightclub] shooting.

*Crosby*, 921 F.3d at 626. After-the-fact ratification of a previously unauthorized act may make an organization legally responsible in certain contexts, *see generally* Restatement (Third) of Agency § 4.01(1) (2006), but it is not the same as saying that the organization committed, planned, or authorized the act.

The Ninth Circuit's recent decision in *Gonzalez*, 2 F.4th at 879, is also consistent with *Crosby* and with our conclusion here. *Gonzalez* involved three separate appeals in ATA actions against social media companies for deaths and injuries caused by terrorist attacks. One of the appeals dealt with ATA aiding and abetting claims arising from a mass shooting in San Bernardino, California, which left over a dozen persons dead and many others wounded. There, as here, ISIS claimed responsibility for the attack after the fact and one of the two shooters

19

pledged allegiance to then-ISIS leader Abu Bakr al-Baghdadi at some point during the attack. Unlike here, the FBI confirmed that the other shooter in the San Bernardino shooting had face-to-face meetings a few years earlier with five people identified as having links to terrorism. *See id.* at 884, 911.

Still, despite a stronger connection between the San Bernardino shooting and ISIS, the Ninth Circuit held in *Gonzalez* that "the operative complaint [did] not plausibly allege that ISIS 'committed, planned, or authorized' the San Bernardino [a]ttack." *Id*. at 911.  It was undisputed that the two shooters "planned and carried out the mass killing, [and] the . . . allegations suggest[ed] only that ISIS approved of the shooting *after* learning it had occurred, not that it authorized the attack beforehand." *Id.*[3]

## IV

Finally, we turn to the plaintiffs' Florida-law claims for negligent infliction of emotional distress and wrongful death.  As the district court correctly noted, both of these torts require a showing of proximate cause.  *See, e.g., Alderwoods Grp., Inc. v. Garcia*, 119 So.3d 497, 506 (Fla. 3d DCA 2013) ("a cause of action for emotional distress . . . requires not only actual injury . . . but also a showing of proximate causation"); *Jenkins v. W.L. Roberts, Inc.*, 851 So.2d 781, 783 (Fla. 1st

---

[3] The Ninth Circuit added that even if "Congress intended 'authorized' to include acts ratified by terrorist organizations after the fact, ISIS' statement after the San Bernardino [a]ttack f[ell] short of ratification" because ISIS only praised the shooters and did not adopt their actions as their own." *Gonzalez*, 2 F.4th at 912. Given the allegations here that ISIS claimed responsibility for the Pulse massacre afterwards, we do not rely on this aspect of *Gonzalez*.

20

DCA 2003) ("To establish a cause of action for negligence in a wrongful death action, a plaintiff must allege and prove (1) the existence of a legal duty owed to the decedent, (2) breach of that duty, (3) legal or proximate cause of death was that breach, and (4) consequential damages.").

## A

Proximate cause is a bedeviling concept in tort law, and a "firm definition for the term . . . has escaped judges, lawyers, and legal scholars for centuries." *Kemper v. Deutsche Bank*, 911 F.3d 383, 392 (7th Cir. 2018). Not surprisingly, then, different jurisdictions use varying formulations of proximate cause. *See generally* Mark A. Geitsfeld, *Proximate Cause Untangled*, 80 Md. L. Rev. 420, 429-33 (2021). Even under the ATA, federal courts have set out conflicting versions of proximate cause for direct liability claims. *Compare, e.g., Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 273 (D.C. Cir. 2018) (to show proximate cause under the ATA, a plaintiff must show that the defendant's acts were a "substantial factor" in the sequence of events leading to her injuries and that those injuries were "reasonably foreseeable or anticipated" as a natural consequence of the defendant's conduct), *with, e.g., Fields v. Twitter, Inc.*, 881 F.3d 739, 744 (9th Cir. 2018) (rejecting substantial factor/reasonable foreseeability analysis and holding that

under the ATA "a plaintiff must show at least some direct relationship between the injuries that he or she suffered and the defendant's acts").[4]

Under Florida law, a "harm is 'proximate' in a legal sense if prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question." *Ruiz v. Tenet Hialeah Healthsystem, Inc.*, 260 So.3d 977, 982 (Fla. 2018) (citation and internal quotation marks omitted). "In the absence of a 'freakish and improbable chain of events' leading to injury, 'the question of foreseeability as it relates to proximate causation generally must be left to the factfinder to resolve.'" *Id.* (citation omitted). Where a third party (like Mr. Mateen) has committed an intentional tort or criminal act causing the plaintiff's injuries, "[t]he proper question is whether th[at] individual's conduct is 'so unusual, extraordinary, or bizarre (i.e., so unforeseeable) that the policy of the law will relieve the [defendant] of any liability for negligently creating [the] dangerous situation." *Goldberg v. Fla. Power & Light Co.*, 899 So.2d 1105, 1116 (Fla. 2005).

## B

Given that their negligent infliction of emotional distress and wrongful death claims sound in Florida law, one would have expected the plaintiffs to have

---

[4] We have not addressed proximate causation with respect to secondary liability under the ATA given our conclusion that the Pulse shooting was not an act of international terrorism that was committed, planned, or authorized by ISIS.

expounded in their brief on the general principles summarized above. But their discussion is remarkably silent on Florida law. In the two paragraphs they devote to their Florida-law claims, the plaintiffs argue only that because they have established proximate cause under the ATA (using the substantial factor/reasonable foreseeability standard), they have also satisfied proximate cause under Florida law. The two Florida cases that the plaintiffs cite stand only for the unremarkable proposition that their two tort claims require a showing of proximate cause. *See* Appellants' Br. at 40.[5]

The plaintiffs' argument is based on a mistaken assumption. Florida does use the substantial factor/reasonable foreseeability standard for proximate cause, *see Ruiz*, 260 So.3d at 982, and some federal courts have employed a similar standard under the ATA. But that tells us little, for the enunciation of a standard in the abstract only takes on meaning as that standard is applied in practice. Proximate cause is a common-law concept in Florida, and the state's courts have

---

[5] In *Crosby*, which involved claims against the same social media companies arising out of the Pulse massacre, the district court and the Sixth Circuit held that the plaintiffs' claims for negligent infliction of emotional distress and wrongful death under Michigan law failed because the complaint did not adequately plead proximate cause. *See* 330 F.Supp.3d at 580; 921 F.3d at 627. Whether or not the *Crosby* courts got the Michigan law claims right with respect to proximate cause, their rulings are certainly relevant to the state-law claims in this case, for the simple reason that Michigan employs a but-for/reasonable foreseeability standard for proximate cause that is similar to Florida's. *See Skinner v. Square D Co.*, 516 N.W.2d 475, 479 (Mich. 1994). The plaintiffs, however, do not discuss this aspect of *Crosby* in their brief. *See also Copeland*, 352 F.Supp.3d at 976 (holding that the plaintiffs, whose relatives and family members were killed during an ISIS truck attack in Nice, France, failed to sufficiently allege proximate cause for their tort claims under California law when suing social media companies for allegedly aiding and abetting ISIS by allowing it to use their platforms to spread extremist propaganda).

23

applied it in a number of cases involving intentional criminal acts committed by third parties. In our view, at least some of those decisions point in different directions. We use cases involving the unlawful sale of firearms as an example.

In *K-Mart Enterprises of Florida*, *Inc v. Keller*, 430 So.2d 283 (Fla. 3d DCA 1983), a retailer sold a rifle to a purchaser in violation of federal law (the purchaser had been charged with a felony at the time of the sale), and six weeks later the purchaser lent his brother—an alcoholic and ex-heroin addict—the rifle and a box of ammunition. The brother shot a police officer during a confrontation, and the officer sued the retailer for negligence. The jury returned a verdict in favor of the officer, and the Third District affirmed, holding that it could have found that the retailer's unlawful sale of the rifle was a proximate cause of the officer's injury: "[W]e conclude that the jury could have properly found the shooting of [the officer] was the type of harm, or 'within the risk' designed to be prevented by the [federal] Gun Control Act—the misuse of a firearm by a responsible purchaser—so that [the retailer's] non-adherence to that statute constituted a legal cause of the [officer's] injuries." *Id.* at 286.

Several years later, the Second District came to a different conclusion. In *Everett v. Carter*, 490 So.2d 193 (Fla. 2d DCA 1986), a firearm retailer knowingly sold a gun to a 19-year-old teenager (with his adult sister serving as the straw

24

purchaser) in violation of federal law. Six weeks later, the teenager used the gun to kill another person and the victim's estate sued the retailer for negligence.

The Second District upheld the trial court's grant of summary judgment in favor of the retailer on the ground that the unlawful sale was not the proximate cause of the victim's death. It explained that under "an anomaly" in Florida law, persons over the age of 18 could legally possess a gun and ammunition even though under federal law they could not lawfully purchase those items. *See id.* at 194-95. As a result, it held that "[the purchaser's] commission of a criminal act six weeks after the purchase and delivery of the firearm could not have been proximately caused by the delivery of the firearm in violation of [federal law]. . . . [The purchaser's] criminal act of killing [the victim] was an independent intervening cause that was not within the realm of reasonable foreseeability on the part of the [retailer]." *Id.* at 195 (citation omitted). In closing, the Second District distinguished the Third District's decision in *Keller* on the ground that the 19-year-old purchaser "was under no legal prohibition under either federal or state law from possessing or owning the weapon in question." *Id.*

Then came *Coker v. Wal-Mart Stores, Inc.*, 642 So.2d 774 (Fla. 1st DCA 1994). In that case, a vendor had sold ammunition to minors in violation of federal law, and the minors then used the bullets (along with a gun) to kill a store clerk during a robbery. The clerk's estate sued the vendor for negligence, and the trial

25

court dismissed the complaint under the rationale of *Carter* because Florida law did not prohibit minors from possessing firearms or ammunition. *See id.* at 776-77.

The First District reversed the trial court's dismissal of the complaint. It explained that lawful possession was only one of the reasons for the Second District's decision in *Carter*, with the others being the six-week period between the unlawful sale and the killing and the intentional nature of the killing. *See id.* at 777. But then, after attempting to distinguish *Carter*, the First District rejected its rationale and agreed with the Third District's decision in *Keller*: "The argument that the legality of possession is pivotal to the issue of proximate causation under these circumstances entirely defeats the congressional purpose of [the federal law] and renders its provisions a nullity. For the same reason, the proposition that *criminal* acts resulting from the unlawful sale of firearms or ammunition should be treated differently under a proximate causation analysis from negligent acts is equally unavailing." *Id.* at 777-78. The First District concluded with this language: "[W]e are unwilling to hold as a matter of law in ruling on a motion to dismiss that an ammunition vendor's violation of [federal law] cannot be found to be the proximate cause or injury or death caused by the purchaser's intentional or criminal act. Rather, we conclude the complaint sufficiently alleged a causal relationship between [the victim's] death and [the vendor's] negligence in selling

26

the ammunition to [the minors] in violation of the statute." *Id.* at 778 (citations omitted).

Looking outside of the context of unlawful firearm sales—which can constitute negligence per se—Florida law is not much clearer. In *Barnes v. Gulf Power Co.*, 517 So.2d 717 (Fla. 1st DCA 1987), the First District (which later decided *Coker*) addressed a negligence claim against a power company whose telephone repairmen had been brutally attacked by unknown assailants at a work site. The repairmen argued that the power company had been negligent in "maintaining its electrical lines and in misrepresenting that it would send out repairmen to repair the lines, thereby delaying the telephone repair job until after darkness fell and proximately causing [their] injuries." *Id.* at 718. *See also id.* at 720 (Ervin, J., concurring) (explaining that the power company had initially dispatched its repairmen to the wrong location). The First District affirmed the grant of summary judgment in favor of the power company on the ground that "there was no causal connection between the alleged negligence . . . and the [repairmen's] injuries." *Id.* "Assuming [the power company] was negligent as alleged," the First District wrote, that negligence "at most[ ] provided the occasion for the attack and the resulting injuries to the [repairmen]. . . . [U]nder the facts in this case . . . the attack upon the [repairmen] by the unknown assailants was an independent efficient intervening cause of the [repairmen's] injuries." *Id.*

27

Concurring separately in *Barnes*, Judge Ervin relied on the Restatement (Second) of Torts. He concluded that "although [an] actor ordinarily would not be obliged to protect another from the criminal acts of third persons, he may be required to do so in certain situations because of the nature of the relationship between him and the injured party, such as special relationships (i.e., carrier and passenger, landlord and tenant, innkeeper and guest, etc.) or by contract where 'the actor has undertaken a duty to protect the other against such misconduct.'" *Id.* at 723 (quoting Restatement (Second) of Torts § 302B, comment e (1965)).

In addition to *Barnes*, there are other Florida cases which bear on the question of proximate cause when a defendant has allegedly caused harm through a third party's criminal conduct. These include *K.M. ex rel. D.M. v. Publix Super Markets, Inc.*, 895 So.2d 1114, 1117 (4th DCA 2005) ("Florida recognizes the special relationship exception to the general rule of non-liability for third-party misconduct."); *Fernandez v. Miami Jai Alai, Inc.*, 386 So.2d 4, 5-6 (Fla. 3d DCA 1980) ("If an intervening criminal act is foreseeable, the original negligence may be found to be the proximate cause of the damage sustained."); and *Wometco Theatres Corp. v. Roth*, 123 So.2d 472, 473 (Fla. 3d DCA 1960) ("Mere knowledge that a person may be a child molester is not knowledge that he would become violent, nor is it sufficient knowledge from which the defendant's

28

employees could have reasonably anticipated violence which would or might result in injury to another patron.").

The Restatement (Second) of Torts is not much help with respect to Florida law on proximate cause in these circumstances. First, the Restatement does not use the concept of proximate cause and opts for legal cause as the appropriate standard. *See* Restatement (Second) of Torts § 431 ("The actor's negligent conduct is a legal cause of harm to another if (a) his conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm."). Second, the Restatement's relevant liability provisions—which do allude to foreseeability— understandably are couched in broad terms and do not appear to provide a clear answer in this case. *See, e.g.,* § 302B ("An act or omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal.") (cited in *Barnett v. Dept. of Financial Services*, 303 So.3d 508, 514 (Fla. 2020)); § 442B ("Where the negligent conduct of the actor creates or increases the risk of a particular harm and is a substantial factor in causing that harm, the fact that the harm is brought about through the intervention of another force does not relieve the actor liability, except where the harm is intentionally caused by a third person and is not within the scope

of the risk created by the actor's conduct."); § 449 ("If the likelihood that a third

person may act in a particular manner is the hazard or one of the hazards which

makes the actor negligent, such an act whether innocent, negligent, intentionally

tortious, or criminal does not prevent the actor from being liable for the harm

caused thereby.") (cited in *Merill Crossings Associates v. McDonald*, 705 So.2d

560, 562 (Fla. 1997)).[6]

We offer these cases and authorities only to illustrate the lack of clarity in

Florida on proximate cause in scenarios similar to ours.  There may be other

relevant decisions, as we have not attempted a complete and thorough survey.  The

point is that we cannot make sense of Florida law on proximate cause in

circumstances like the ones alleged in the complaint without knowing what the

relevant judicial opinions are and what the parties think about them.  We could, of

course, dive headlong into Florida law ourselves and try to figure out the answer.

But that is not how the adversarial process is supposed to work.  Having a federal

---

[6] *See also* Dan H. Dobbs et al., 1 The Law of Torts § 209 (2d ed. 2011 & June 2021 Supp.) ("If
an intervening and unforeseeable intentional harm or criminal act triggers the injury to the
plaintiff, the criminal act is ordinarily called a superseding cause, with the result that the
defendant who negligently creates the opportunity for such acts escapes liability. . . . The
backside of the general rule that insulates the defendant from liability in cases of unforeseeable
intervening criminal acts is that if a criminal or intentional intervening act is foreseeable, or is
part of the original risk negligently caused by the defendant in the first place, then the harm is
not outside the scope of the defendant's liability—or as most courts still put it, the criminal or
intentional act is not a superseding cause.").

court make an educated guess on an open question of state law is serious business, and it should not be done *sua sponte* without the parties' input.

By failing to bring the critical Florida cases (and other relevant authorities) to our attention, and by failing to address them, the plaintiffs have effectively abandoned their contention that the district court mistakenly dismissed their Florida tort claims for failure to sufficiently plead proximate cause.    *Cf. Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) ("If an argument is not fully briefed [on appeal], evaluating its merits would be improper both because appellants may control the issues the raise on appeal and because the appellee[s] would have no opportunity to respond to it.").  We therefore leave for another day whether the sort of facts alleged in the complaint can plausibly make out the proximate cause element of a tort claim based on negligence under Florida law.

V

We affirm the district court's dismissal of the plaintiff's claims for aiding and abetting under the ATA and for negligent infliction of emotional distress and wrongful death under Florida law.

**AFFIRMED.**

31