United States Court of Appeals
Fifth Circuit

**F I L E D**

**September 19, 2006**

Charles R. Fulbruge III
Clerk

*In the United States Court of Appeals
for the Fifth Circuit*

No. 04-31200

BERTUCCI CONTRACTING CORPORATION,

     Plaintiff,

 v.

M/V ANTWERPEN, Etc.; ET AL.,

     Defendants,

MARVITA SHIPPING COMPANY LTD.,

     Defendant - Third Party Plaintiff -
     Appellant,

 v.

M/V LADY JEANETTE, her engines, boilers, tackle, equipment,
furniture, apparel, etc., in rem; F & L MARINE MANAGEMENT
INC.; SANDBAR III INC.,

     Third Party Defendants - Appellees.

_____

MARVITA SHIPPING COMPANY LTD.,

     Plaintiff - Appellant,

 v.

M/V LADY JEANETTE, Etc.; ET AL.,

     Defendants,

M/V LADY JEANETTE, her engines, boilers, tackle, equipment,
furniture, apparel, etc., in rem; SANDBAR III INC., in
personam; F & L MARINE MANAGEMENT INC.,

Defendants - Appellees.

In Re: In the Matter of the Complaint of F & L MARINE
MANAGEMENT INC.; SANDBAR III INC., for Exoneration from or
Limitation of Liability
------------------------------------------
F & L MARINE MANAGEMENT INC., as owner pro hac vice; SANDBAR
III INC., as owner of M/V Lady Jeanette, her engines, tackle,
appurtenances, furniture, etc.,

                    Petitioners - Appellees,

     v.

MARVITA SHIPPING COMPANY LTD.,

                    Claimant - Appellant.

Appeal from the United States District Court
for the Eastern District of Louisiana

Before GARWOOD, PRADO, and OWEN, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

This appeal arises out of an unsuccessful claim by Marvita Shipping Company, Ltd.,

the owner of the M/V ANTWERPEN, against the interests of the M/V LADY JEANETTE

for allegedly "embarrassing the navigation" of the ANTWERPEN and causing it to allide

with a fleet of stationary barges on the east bank of the Mississippi River.[1]  Marvita claims

that a new trial is necessary because the LADY JEANETTE created a risk of collision and

---

[1]"An allision is a collision between a moving vessel and a stationary object."  THOMAS J.
SCHOENBAUM, ADMIRALTY & MARITIME LAW 14-2 (4th ed. 2004).

2

violated several navigation rules as a matter of law, and accordingly, the district court should have required the LADY JEANETTE to prove that her navigation could not have been a contributory and proximate cause of the accident.[2] Because the district court's judgment was not based on a clearly erroneous view of the facts or a misunderstanding of the applicable law, we affirm.

## I

Around 2:00 a.m. on January 19, 2003, several vessels passed through the Carrollton Bend, a turn in the Mississippi River located near the Nine Mile Point, which is below the Huey P. Long Bridge and immediately above the City of New Orleans. The LADY JEANETTE, a 50.5-foot long and 24-foot wide tugboat, was pushing four loaded barges in a two-by-two configuration downbound (south) on the river. Also proceeding downbound were the BAYOU BLACK and the BEVERLY ANDERSON. The ALICE HOOKER and the ANTWERPEN, a 653-foot long and 96-foot wide oceangoing bulk freighter, were headed upbound (north) on the river. Captain Kenneth Ayars of the LADY JEANETTE radioed Teal M. Grue, a compulsory river pilot assisting the ANTWERPEN, to discuss the traffic situation. Pilot Grue proposed to overtake the upbound ALICE HOOKER, which decided to hold up on the west bank until the traffic cleared, on the ANTWERPEN's port (left) side. Continuing to proceed across the river, the upbound ANTWERPEN would then meet the

---

[2]*See, e.g.*, *Tokio Marine & Fire Ins. Co. v. FLORA MV*, 235 F.3d 963, 966 (5th Cir. 2001) ("Under the *Pennsylvania* rule, if a vessel involved in a collision was violating a statutory rule intended to prevent collisions, the burden shifts to the violating vessel to show that its fault could not have been a cause of the accident.").

downbound BEVERLY ANDERSON for a starboard-to-starboard (right side or "two whistle"[3]) passing. Pilot Grue and Captain Ayars agreed to then pass each other on their port sides (a "one whistle" passing), with the LADY JEANETTE navigating close to the right descending (west) bank (the bank to the right when proceeding down the river).

Though the vessels passed each other successfully, Marvita maintains that the LADY JEANETTE violated the passing agreement by failing to stay close to the right descending bank and, instead, headed straight toward the ANTWERPEN. Marvita further claims that Pilot Grue had to decrease his speed and turn the front end of the ANTWERPEN (the bow) and then the back end (the stern) to the right in a "see-sawing" motion to avoid colliding with the LADY JEANETTE. Captain Ayars, on the other hand, claims that he did not steer toward the ANTWERPEN until he was "in the pocket," with his bow past the ANTWERPEN's bow, and that the ANTWERPEN could not have hit the LADY JEANETTE if she tried. In any event, after passing the LADY JEANETTE, Pilot Grue realized he faced an imminent allision with a stationary fleet of barges located on the left descending bank, across from the Nine Mile Point. He then sounded the danger signal, ordered the engines reversed, and crashed into the barges.

The owner of the barges, Bertucci Construction, sued the ANTWERPEN *in rem* and Marvita *in personam* for damages. Marvita claimed that the LADY JEANETTE caused the

---

[3]*See generally* Inland Navigational Rules, Rule 34, 33 U.S.C. § 2034(a) (mandating that when two vessels are headed toward one another, each vessel shall propose the manner of passing by radio communication or by blowing her whistle—once to propose passing on each vessel's port side and twice to propose passing on each vessel's starboard side).

allision by failing to navigate close enough to the right descending bank in accordance with the passing agreement and by forcing the ANTWERPEN to navigate too close to the left descending bank (and toward the barges) in an effort to avoid a collision with the LADY JEANETTE. Marvita filed a third-party complaint against the LADY JEANETTE, its owner Sandbar III, Inc., and its operator F&L Marine Management, Inc. Marvita also filed a separate complaint, asserting an admiralty and maritime claim under Rule 9(h) of the Federal Rules of Civil Procedure against the LADY JEANETTE, Sandbar, and F&L. Sandbar and F&L then sought exoneration from liability or limitation of liability to the value of the LADY JEANETTE. The claims were consolidated for trial, Marvita and Bertucci settled before trial, and Marvita's remaining claims against the LADY JEANETTE, Sandbar, and F&L proceeded to a bench trial.

The district court found that the LADY JEANETTE adhered to the passing agreement and complied with the applicable navigation rules and that the ANTWERPEN's allision with the Bertucci fleet was caused by Pilot Grue's failure to maintain proper steerageway—by decreasing his speed too much when navigating around the Carrollton Bend, he got caught in the current and lost control of the vessel. The district court entered judgment in favor of the LADY JEANETTE, Sandbar, and F&L upon concluding that the LADY JEANETTE was not negligent in its navigation and did not embarrass the ANTWERPEN's navigation. Marvita moved for a new trial, and the district court denied the motion after finding that Marvita simply reiterated the evidence already considered by the court at trial and failed to demonstrate error or injustice in the court's decision. Marvita appeals the district court's

5

judgment and requests that this court vacate the judgment and remand for a new trial.

## II

Because this case was decided by the district court without a jury, we review the district court's factual findings for clear error: "Findings of fact . . . shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge [] the credibility of the witnesses."[4] If the district court's finding is plausible in light of the record viewed as a whole, the court of appeals cannot reverse even though, if sitting as the trier of fact, it would have weighed the evidence differently.[5] "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."[6] A finding is clearly erroneous when the appellate court, viewing the evidence in its entirety, "is left with the definite and firm conviction that a mistake has been committed."[7] The court owes even greater deference to findings based on the credibility of witnesses and must uphold them if based on coherent, internally consistent, and facially plausible testimony that is not contradicted by external evidence.[8] In an admiralty case tried before a court without a jury, the district court's findings of negligence, cause-in-fact, and

---

[4]FED. R. CIV. P. 52(a); *see also Anderson v. Bessemer City*, 470 U.S. 564, 573–75 (1985) (discussing the clearly erroneous standard).

[5]*Anderson*, 470 U.S. at 573–74.

[6]*Id.* at 574.

[7]*Walker v. Braus*, 995 F.2d 77, 80 (5th Cir. 1993).

[8]*Anderson*, 470 U.S. at 575.

proximate cause are treated as factual findings subject to the clearly erroneous standard.[9] As

we have previously stated:

> Although the question of whether given behavior is sufficiently improper to constitute negligence is frequently reviewed on appeal, the question of whether a party is at fault in causing or contributing to the causation of some calamity is largely one of fact. . . . [T]he standards of behavior [] are set by law—whether behavior meets those standards is a question of fact, measured on appeal by the clearly erroneous standard.[10]

If a finding is based on a mixed question of law and fact, this court should only reverse "if

the findings are based on a misunderstanding of the law or a clearly erroneous view of the

facts."[11]

The crux of Marvita's argument is that, because Captain Ayars of the LADY

JEANETTE testified to (1) seeing the ANTWERPEN's masthead lights nearly in line,

(2) "falling off the point" on the right descending bank, and (3) steering the LADY

JEANETTE toward the left descending bank, he could not have complied with the passing

agreement or with Inland Navigational Rule 7 (Risk of Collision), Rule 8 (Action to Avoid

Collision), Rule 9 (Narrow Channels), or Rule 14 (Head-on Situation).[12]  Instead, according

to Marvita, the LADY JEANETTE must have been navigating on the left descending bank

---

[9]*In re Luhr Bros., Inc.*, 325 F.3d 681, 684 (5th Cir. 2003).

[10]*Movible Offshore, Inc. v. M/V WILKEN A. FALGOUT*, 471 F.2d 268, 272–73 (5th Cir. 1973).

[11]*Tokio Marine*, 235 F.3d at 966.

[12]*See* Inland Navigational Rules, Rule 7, 33 U.S.C. § 2007; Rule 8, 33 U.S.C. § 2008; Rule 9, 33 U.S.C. § 2009; Rule 14, 33 U.S.C. § 2014.

side of the river and directly toward the ANTWERPEN, thereby creating a risk of collision.[13]

Once a risk of collision exists, the navigation rules mandate the appropriate response—here, for each vessel to turn to starboard and pass on each other's port side.[14] Marvita contends that once the vessels faced a risk of collision, the LADY JEANETTE turned to port instead of starboard, thus creating a close-quarters, near-miss situation and violating several Inland Rules. Marvita argues that the district court took an impermissible view of the evidence and erred as a matter of law by failing to find that a risk of collision existed and that the LADY JEANETTE's response was in violation of Rules 7, 8, 9, and 14. If the district court had concluded that the LADY JEANETTE violated one of those rules, the court would have had to apply the *Pennsylvania* rule and require the LADY JEANETTE to prove that her navigation could not have been a contributory and proximate cause of the allision.[15] Since

[13]*See* Inland Navigational Rules, Rule 14, 33 U.S.C. § 2014(b) ("Such a situation [risk of head-on collision] shall be deemed to exist when a vessel sees the other ahead or nearly ahead and by night she could see the masthead lights of the other in a line or nearly in a line or both sidelights and by day she observes the corresponding aspect of the other vessel."); Rule 7, 33 U.S.C. § 2007(a) ("Every vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist.").

[14]*See* Inland Navigational Rules, Rule 14, 33 U.S.C. § 2014(a) ("Unless otherwise agreed, when two power-driven vessels are meeting on reciprocal or nearly reciprocal courses so as to involve risk of collision each shall alter her course to starboard so that each shall pass on the port side of the other.").

[15]*See, e.g.*, *Tokio Marine*, 235 F.3d at 966 ("Under the *Pennsylvania* rule, if a vessel involved in a collision was violating a statutory rule intended to prevent collisions, the burden shifts to the violating vessel to show that its fault could not have been a cause of the accident."); *In re Mid-South Towing Co.*, 418 F.3d 526, 534 (5th Cir. 2005) (explaining that, even under the burden of the *Pennsylvania* rule, "fault which produces liability must be a contributory and proximate cause of the collision, and not merely fault in the abstract") (quoting *Bd. of Comm'rs of Port of New Orleans v. M/V FARMSUM*, 574 F.2d 289, 297 (5th Cir. 1978)); *see also The Pennsylvania*, 86 U.S. (19 Wall.) 125 (1873).

the district court did not find a violation, and accordingly did not apply the *Pennsylvania* rule, Marvita argues that a new trial is necessary.

Although there is evidence to support Marvita's claim that the LADY JEANETTE violated the navigation rules and the passing agreement by failing to navigate close to the right descending bank, we are not "left with the definite and firm conviction that a mistake has been committed" after reviewing the evidence in its entirety.[16]  In addition to testifying that, at one point, he saw the ANTWERPEN's masthead lights nearly in line and to drawing two sketches (admitted into evidence) showing the same, Captain Ayars testified that the ANTWERPEN's lights were "opening all the time" as the vessels approached.  The LADY JEANETTE's expert explained that as two vessels properly pass each other in a bend, like the Nine Mile Point–Carrollton Bend, the vessels' lights should be constantly changing as one vessel rounds the point and the other rounds the bend.  According to the expert's testimony, Captain Ayars's sketches and his testimony that he saw the lights in line at one moment represent a snapshot of the vessels' passing and are consistent with his testimony that the lights were constantly changing.  Crediting this testimony, the district court did not clearly err by concluding that Captain Ayars did not navigate directly toward the ANTWERPEN.

Marvita also argues that Captain Ayars admitted that he violated the passing agreement by failing to navigate close to the right descending bank when he testified that he

---

[16]*Walker v. Braus*, 995 F.2d 77, 80 (5th Cir. 1993).

"fell off the point," referring to the Nine Mile Point on the right descending bank. The district court credited Captain Ayars's testimony that he initially navigated close to the right descending bank, in accordance with the passing agreement, and that he only started heading toward the ANTWERPEN and the left descending bank when he saw that he would be able to navigate safely behind the ANTWERPEN's stern (the back end of the vessel). Captain Ayars testified that when he moved toward the ANTWERPEN, he was "in the pocket," with his bow (the front end of the vessel) past the bow of the ANTWERPEN. According to Captain Ayars, the LADY JEANETTE was about 400 feet (give or take 100 feet) off the right descending bank when the vessels passed, and the vessels were between 150 to 200 feet apart. He further testified that the ANTWERPEN could not have hit the LADY JEANETTE if she tried. Putting Captain Ayars's testimony that he "fell off the point" in context, the district court did not clearly err in finding that the LADY JEANETTE complied with the passing agreement by navigating on the right descending bank side of the river.

Furthermore, the district court found that there was contemporaneous evidence supporting the LADY JEANETTE's version of events. First, neither the ANTWERPEN nor the LADY JEANETTE recorded any incident with the other vessel in their deck logs. The LADY JEANETTE's expert testified that if the ANTWERPEN had viewed the passing of the LADY JEANETTE as a near collision or as embarrassing the ANTWERPEN's navigation, the ANTWERPEN would likely have recorded the matter in its deck log for the day. Moreover, considering the radio transmissions as a whole, the district court found that neither vessel thought that a collision was possible or that the ANTWERPEN needed more

10

room to safely pass the LADY JEANETTE. Although Pilot Grue at one point asked the LADY JEANETTE if she was all right and radioed that he did not think "it's gonna work," he did not sound the danger signal prior to or while he was passing the LADY JEANETTE, and he did not communicate that he needed more room. The district court could have reasonably concluded that Pilot Grue's transmissions would have conveyed a greater sense of alarm if the vessels were at risk of colliding. Furthermore, Captain Ayars continuously radioed that he was all right and that the ANTWERPEN had plenty of room. Marvita relies heavily on one transmission, in which Pilot Grue states "hard over . . . laying along side me," and on Pilot Grue's testimony that he would never have had to ask the LADY JEANETTE to lay flat, alongside the ANTWERPEN, if the vessels passed at a safe distance. The district court was free to weigh the evidence as it saw fit and did not have to credit Pilot Grue's testimony.[17]

Finally, the district court's factual finding with regard to the cause of the ANTWERPEN's allision with the Bertucci fleet of barges was not clearly erroneous. The LADY JEANETTE's expert, Captain Strouse, opined that the ANTWERPEN failed to proceed at the speed necessary to maintain steerageway—the minimum rate of motion needed to maneuver the vessel—and therefore got caught in the current and was pushed toward the right descending bank. Captain Strouse testified as to his opinion why the

---

[17]*See Anderson*, 470 U.S. at 573–74 ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.").

11

ANTWERPEN allided with the barges:

> Because of the current pushing them. Well, because of the slow speed, because they did not try to drive out of it, or if they did try to drive out of it, it was too late. And with that current coming down at slow speed, you have no [] response from your rudder and you've got a deeply laden ship, that current is going to take it right in towards the eastbank.

The district court chose to credit this testimony over the testimony of the witnesses offered by the ANTWERPEN, specifically the captain of the ALICE HOOKER, who testified that the only reason the LADY JEANETTE did not collide with the ANTWERPEN was Pilot Grue's "beautiful job" maneuvering the ship, and who thereby implied that the LADY JEANETTE embarrassed the ANTWERPEN's navigation and contributed to the allision. Only the district court, hearing the testimony firsthand, "can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said."[18]

When the evidence is viewed in its entirety, we are not "left with the definite and firm conviction"[19] that the district court clearly erred by concluding that the LADY JEANETTE complied with the passing agreement and passed the ANTWERPEN at a safe distance and that the ANTWERPEN's allision was caused solely by her failure to maintain proper steerageway. Moreover, under the version of events that the district court credited or could have reasonably credited, the LADY JEANETTE did not violate any of the applicable

___

[18]*Id.* at 575.

[19]*Walker*, 995 F.2d at 80.

navigation rules. Marvita argues that Rules 9 and 14, the Narrow Channel rules, applied to the passing and required the LADY JEANETTE to stick as close to the right descending bank as was safe and practicable and to turn to starboard and pass the ANTWERPEN on its port side. Marvita contends that the LADY JEANETTE violated Rule 9 by "falling off the point" on the right descending bank[20] and Rule 14 by turning to port even though the vessels were meeting on "reciprocal or nearly reciprocal courses."[21] Even assuming that the Carrollton Bend–Nine Mile Point, which was estimated at trial to be between 1320 and 2100 feet wide at its narrowest point, is a "narrow channel,"[22] and that Rules 9 and 14 apply despite the passing agreement between the parties,[23] the LADY JEANETTE complied with both rules according to the evidence that the district court credited or could have plausibly credited.

---

[20]Inland Navigational Rules, Rule 9, 33 U.S.C. § 2009(a)(i) ("A vessel proceeding along the course of a narrow channel or fairway shall keep as near to the outer limit of the channel or fairway which lies on her starboard side as is safe and practicable.").

[21]Inland Navigational Rules, Rule 14, 33 U.S.C. § 2014(a) ("Unless otherwise agreed, when two power-driven vessels are meeting on reciprocal or nearly reciprocal courses so as to involve risk of collision each shall alter her course to starboard so that each shall pass on the port side of the other."); *Id.* § 2014(b) ("Such a situation shall be deemed to exist when a vessel sees the other ahead or nearly ahead and by night she could see the masthead lights of the other in a line or nearly in a line . . . .").

[22]*See, e.g.*, *Canal Barge Co. v. China Ocean Shipping Co.*, 770 F.2d 1357, 1362 (5th Cir. 1985) (noting that the determination of what constitutes a narrow channel is a mixed question of law and fact, depending not only on the physical dimensions of the water, but also on the character of the navigational use); *Marine Transp. Lines, Inc. v. M/V TAKO INVADER*, 37 F.3d 1138, 1142–43 (5th Cir. 1994) (observing that lower courts have generally not deemed channels wider than 1200 feet as narrow channels, but noting that physical dimension is not dispositive).

[23]*See, e.g.*, *Burma Navigation Corp. v. RELIANT SEAHORSE MV*, 99 F.3d 652, 658 (5th Cir. 1996) ("Vessels navigating the Mississippi River must adhere to the Narrow Channel Rules (Rules 9 and 14) *unless otherwise agreed*." (emphasis added)).

Specifically, she navigated close to the right descending bank, passed the ANTWERPEN on the vessel's port side at a safe distance, and did not turn to port (toward the ANTWERPEN and the left descending bank) until she was "in the pocket" and able to safely navigate behind the ANTWERPEN's stern.

Moreover, according to the evidence presented at trial, when viewed as a whole, the district court could reasonably have concluded that the LADY JEANETTE and the ANTWERPEN passed at a safe distance and were never at risk of colliding. Therefore, the navigation rules regarding risk of collision in general (specifically Rules 7 and 8) would not apply, and the district court's conclusion that the LADY JEANETTE did not violate them was not based on a misunderstanding of the law. Marvita's principal argument to the contrary is that the district court misunderstood the meaning of "risk of collision" and thus erred in its application of the law to the facts. Specifically, because the court, in finding no risk of collision, mentioned Pilot Grue's failure to communicate to Captain Ayars that he thought the vessels were at "imminent" risk of collision, Marvita argues that the district court erroneously thought a risk of collision exists only when a collision is imminent. Marvita cites a Second Circuit decision, which states that "it is not necessary for a collision to be imminent or even probable before the obligation imposed by [the rules] accrues[,] . . . [but] '[t]here is danger or risk of collision whenever it is not clearly safe to go on.'"[24] We are not persuaded that the district court misunderstood the law by using the term "imminent" in

_____

[24]*Ocean Marine Ltd. v. U.S. Lines Co.*, 300 F.2d 496, 499 (2d Cir. 1962) (quoting *The Aurania*, 29 F. 98, 123 (S.D.N.Y. 1886)).

14

reference to the existence of a risk of collision because the court concluded that the *risk* of collision was not imminent, not that the collision itself was not imminent.  Moreover, in finding no risk of collision, the district court could reasonably have credited Captain Ayars's testimony that the ANTWERPEN could not have hit the LADY JEANETTE if she tried and concluded that collision was not simply a remote possibility, but an impossibility.

Because we do not find the district court's factual findings regarding negligence and causation clearly erroneous, nor its legal conclusions based on a misunderstanding of the navigation rules, we AFFIRM the district court's judgment in favor of the LADY JEANETTE, F & L Marine Management, and Sandbar III, Inc.