# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 13, 2025

Lyle W. Cayce
Clerk

————————

No. 22-30382

————————

Bosit Bommarito, III, *Deceased*; Susan Bommarito, *as Succession Independent Administrator of* The Estate of Bosit Bommarito, III; Sheila Mae Callais, *as Legal Tutor of decedent's minor children*; Bosit Bommarito, IV,

*Plaintiffs—Appellees*,

*versus*

Belle Chasse Marine Transportation, L.L.C.; Belle Chasse Land Transportation, Incorporated; Talisman Casualty Insurance Company, L.L.C.,

*Defendants—Appellants*.

————————————————————

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:21-CV-204

————————————————————

Before Richman, Haynes, and Graves, *Circuit Judges*.

Priscilla Richman, *Circuit Judge*:

Bosit Bommarito was injured on the job while constructing a launch site on the Mississippi River. After seeing numerous physicians and undergoing surgery for his injury, Bommarito overdosed on a combination of street fentanyl and Xylazine, a drug not prescribed for human use. We conclude that, under the circumstances of this case, Bommarito's ingestion

of an illegal drug was a superseding cause of his death that is not traceable to his work injury. We therefore reverse the award of the damages stemming from Bommarito's death and remand for further proceedings.

## I

Belle Chasse Marine Transportation, LLC (Marine) provides launch services transporting personnel and goods to and from vessels on the Mississippi River. Belle Chasse Land Transportation, Inc., (Land) builds Marine's launch sites. Land is a wholly owned subsidiary of Marine—the two companies share insurance policies, a human resources department, and officers.

Bosit Bommarito was a welder who helped Land construct the walkways on Marine's launch sites. John Clulee, who worked with Bommarito, was a deckhand and the crane operator of the OC160 crane barge, although he did not have a crane operator's license, was not certified to operate a crane as required by OSHA, and never took Marine's crane operator safety training course. The OC160 was a crane barge owned by Marine but maintained and used by Land.

On this barge, there was a set of hooks that were part of the crane rigging and stored on the OC160 when not in use. These hooks were designed by Brad Gambino and fabricated by Karl Breyer, both Land employees. The hooks did not have a safety latch on them. The hooks needed to be narrow enough to fit through vertical slats in the grating, which had very narrow openings, but it is unclear why the fabricated hooks did not have safety latches. There was testimony at trial that hooks narrow enough to go through the grating, but equipped with safety latches, are commercially available. Also, Occupational Safety and Health Administration and industry standards required the hooks to have safety latches. Clulee testified that because there were no safety latches, Bommarito, the "rigger," had to stand

very close to the crane lines holding them to keep tension before the crane lifts up, otherwise there would be slack in the lines and the hooks would fall out.  However, other testimony and the experts at trial disagreed about whether the hooks required the rigger to keep tension on the lines.

While Bommarito was serving as the rigger and holding the lines to maintain tension, he signaled to Clulee, the crane operator, to start the lift. The lift went too high, causing the metal weld on the walkway section being lifted to break, and the hook to come loose and strike Bommarito, causing him to fall 9 to 12 feet off the walkway.  Bommarito sustained a large cut over his eye which bled profusely, was diagnosed with a concussion, strain, and a fractured eye socket, and was released for light duty.  Bommarito went back to a physician complaining of arm pain, was diagnosed with a displaced C6-7 cervical disk, and had emergency surgery to correct that issue.  During recovery from surgery, he continued to experience shoulder pain and was diagnosed with a torn labrum and referred for evaluation.  Bommarito then had a CT scan, which revealed a "right orbital floor fracture"; his "right eye was sunken in . . . he couldn't move his left eye and right eye together," causing double vision and "pain when moving his eyes."  He was told on February 26th, four months after the accident, that two further surgeries would be needed to alleviate his pain.

During the four months between the accident and the February 26th consult, Bommarito was prescribed Oxycodone, fentanyl, and Tramadol, with the last installment being a fifteen-day supply of Tramadol on February 7th.  After that supply ran out, Bommarito attempted to control his pain with over-the-counter medications, but his mother Susan Bommarito, a retired nurse, testified that he was still experiencing an unacceptable level of pain. She called and attempted to obtain an appointment with a physician but was told there were no earlier appointments available.  The day after that phone call, Susan returned home from the grocery store and found Bommarito

unconscious from what a pathologist determined was an overdose of fentanyl mixed with Xylazine. Xylazine is a horse tranquilizer that is not available for human use, which means the "fentanyl was purchased on the street." Bommarito's autopsy revealed that his blood contained more than six times what is considered to be a lethal dose of fentanyl. Bommarito has no criminal record, and there is no evidence he took illegal drugs before his fatal ingestion.

Bommarito's estate sued Land and Marine (collectively, Belle Chasse) for personal injury under the Jones Act and general maritime law and later added a claim under the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 905(b). After a three-day bench trial, the district court issued its initial and then amended findings of fact and conclusions of law, holding Belle Chasse liable for vessel negligence under the LHWCA and awarding Bommarito's children and mother $575,668.09 in damages. Belle Chasse timely appealed.

## II

We first address jurisdiction. Although jurisdiction is generally a question of law reviewed de novo,[1] here jurisdiction hinges on proximate causation. "In an admiralty case tried before a court without a jury, the district court's findings of . . . proximate cause are treated as factual findings subject to the clearly erroneous standard."[2]

Belle Chasse argues that there is no jurisdiction under the Extension of Admiralty Jurisdiction Act (AEA). The AEA provides that "[t]he

---

[1] *La. Indep. Pharmacies Ass'n v. Express Scripts, Inc.*, 41 F.4th 473, 478 (5th Cir. 2022) (quoting *Elam v. Kan. City S. Ry. Co.*, 635 F.3d 796, 802 (5th Cir. 2011)).

[2] *Bertucci Contracting Corp. v. M/V ANTWERPEN*, 465 F.3d 254, 259 (5th Cir. 2006) (citing *In re Luhr Bros., Inc.*, 325 F.3d 681, 684 (5th Cir. 2003)).

No. 22-30382

admiralty and maritime jurisdiction of the United States extends to and includes cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land."[3]

> To state a claim for a maritime tort, the plaintiff must allege facts sufficient to satisfy the "location test" and "connection test." The location test is satisfied if the tort occurred on navigable waters or if the injury occurred on land but was caused by a vessel on navigable waters. The tort "occurred on" navigable waters if the harm "took effect" there. [To satisfy the connection test,] "the general features of the type of incident involved" must have "a potentially disruptive impact on maritime commerce" [and] . . . "the general character of the activity giving rise to the incident" must show "a substantial relationship to traditional maritime activity."[4]

Belle Chasse does not contest that the connection test is met. As for the location test, the district court pointed out, "[t]o be caused by a vessel, the injury must be 'caused by the vessel itself or its appurtenances.'"[5]  "The

---

[3] 46 U.S.C. § 30101(a).

[4] *In re La. Crawfish Producers*, 772 F.3d 1026, 1029 (5th Cir. 2014) (internal citations omitted) (first citing *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995); then quoting *Egorov, Puchinsky, Afanasiev & Juring v. Terriberry, Carroll & Yancey*, 183 F.3d 453, 456 (5th Cir. 1999); and then quoting *Grubart*, 513 U.S. at 534).

[5] ROA.2833 (quoting *Egorov*, 183 F.3d at 456); *see also Victory Carriers, Inc. v. Law*, 404 U.S. 202, 210-11 (1971) ("The decision in [*Gutierrez v. Waterman S.S. Corp.*, 373 U.S. 206 (1963)] turned, not on the 'function' the stevedore was performing at the time of his injury, but, rather, upon the fact that his injury was caused by an appurtenance of a ship, the defective cargo containers . . . .").

vessel or its defective appurtenances must be the proximate cause of the accident."[6]

The district court here found:

> Mr. Bommarito's injuries were caused by an inadequate and defective hook that hit him. The hook that caused Mr. Bommarito's injuries was attached to a crane, and the crane was attached to the OC 160 barge, whose purpose was to hold the crane. Thus, the hook that caused the injuries was an appurtenance of the barge. Moreover, the hook was defective because it lacked a latch, which required Mr. Bommarito to stand close to the load being lifted to hold the hook secure.

First, Belle Chasse argues that the hooks were not appurtenances of the vessel. Second, they argue that the district court erred in concluding that Land and Marine were fused for the purpose of determining who owned the hooks. Finally, they argue that the hooks were not the proximate cause of the injury.

## A

As a preliminary matter, Belle Chasse contends for the first time on appeal that the district court improperly applied federal admiralty law to the question of whether Land and Marine should be deemed a single entity. We consider this issue only to the extent that it implicates our jurisdiction. Beyond that, it is forfeited.[7]

_____

[6] *Margin v. Sea-Land Servs., Inc.*, 812 F.2d 973, 975 (5th Cir. 1987).

[7] *Rollins v. Home Depot USA*, 8 F.4th 393, 398 (5th Cir. 2021) ("We do not ordinarily consider issues that are forfeited because they are raised for the first time on appeal.").

No. 22-30382

With the invocation of federal admiralty jurisdiction comes "the full panoply of the substantive admiralty law as well."[8]   We understand Belle Chasse to argue that whether the defective hooks on the OC160 are an "appurtenance" so as to invoke our jurisdiction under the Admiralty Extension Act turns on whether the hooks were owned by Land or Marine— and accordingly, the district court set its course by the wrong star when it applied federal admiralty law, rather than Louisiana law, to conclude that Land and Maritime were fused.

We disagree. Whether the hooks were owned by Land, by Marine, or by the fused company is not dispositive of whether they were appurtenances of the OC160 for the purpose of invoking federal admiralty jurisdiction under the Admiralty Extension Act.  An item need not be owned by the vessel owner to be appurtenant to the vessel.[9]  In *Drachenberg*,[10] our court assessed whether a marine unloading arm was an "appurtenance" of a barge for purposes of the warranty of seaworthiness, concluding that: "[C]ertain types of temporary attachment to the vessel by equipment not part of the ship's usual gear or stored on board or controlled by the ship's crew can satisfy the requirements for finding a maritime cause of action."[11]  So too here.  Under the circumstances of this case, the determination that the defective hooks

---

[8] *Exec. Jet Aviation, Inc. v. City of Cleveland, Ohio*, 409 U.S. 249, 255 (1972).

[9] *See Alaska Steamship Co. v. Petterson*, 347 U.S. 396, 396 (1954) (affirming per curiam a Ninth Circuit opinion, 205 F.2d 478 (9th Cir. 1953), allowing seaworthiness recovery to stevedore injured by breaking block owned and brought on board by stevedoring company); *see also Rogers v. U.S. Lines*, 347 U.S. 984, 984 (1954) (reversing per curiam a Third Circuit opinion, 205 F.2d 57 (3d Cir. 1953), denying seaworthiness recovery to longshoreman on basis that land fall runner belonging to stevedore was not appurtenant to vessel); *but cf. Plaisance v. Romanda Sue*, 861 F.2d 858, 858 (5th Cir. 1988) (suggesting that "common ownership with the vessel" is relevant to the analysis).

[10] *Drachenberg v. Canal Barge Co.*, 571 F.2d 912 (5th Cir. 1978).

[11] *Id.* at 920.

7

were appurtenances of the OC160—and therefore that federal admiralty jurisdiction and federal admiralty law apply—does not turn on their ownership. Because the ownership of the hooks does not implicate the basis of our jurisdiction, we leave the issue aside until Part III, *infra*.

## B

We now turn to Belle Chasse's contention that—regardless of ownership—the hooks were not appurtenances of the vessel. We have explained that "[t]he appurtenances themselves must be claimed to be defective extensions of the vessel."[12] Here, the hook was part of the rigging set up on the crane, which was attached to the vessel. The hooks were ordinarily stored on the barge. The hooks were being used in a manner "fundamentally related to traditional maritime activities."[13] Therefore, the hook was an appurtenance of the vessel.

As for proximate causation, Belle Chasse argues that the employees' incorrect performance of their jobs, not the hooks, was the proximate cause, stating that, "[t]o imply that Mr. Bommarito would not have been standing in the 'line of fire' if the hooks had safety latches is not supported by the record and is rank speculation." Belle Chasse points to the testimony of Brad Gambino and contends that Bommarito could have "gotten out the way" and the hooks would have held "even if there was slack in the lines." Belle

---

[12] *Margin v. Sea-Land Servs., Inc.*, 812 F.2d 973, 977 (5th Cir. 1987) ("There was nothing wrong with the hatch cover. The BOSTON did not lower the hatch cover. Cooper was operating the land-based crane that had lifted the hatch cover. No action by the BOSTON caused Margin to scale the stacking frames or to fall to the ground."); *cf. Hufnagel v. Omega Serv. Indus., Inc.*, 182 F.3d 340, 352 (5th Cir. 1999) (explaining that equipment attached to the platform instead of the vessel itself striking the petitioner does not satisfy the location test).

[13] *Drachenberg*, 571 F.2d at 920.

Chasse also points to a video by the hook creator Karl Breyer showing a technique that would not make the hooks slip out even with slack in the lines.

However, there is ample other evidence in the record that, because the hooks lacked safety latches, Bommarito did need to stand near the lines holding tension on them or the hooks would slip out. Testimony from Clulee, who operated the crane with Bommarito every time they constructed one of these docks, explained that "all [Bommarito] had to do was pick me up enough with the strap to put tension on it so the hooks wouldn't come out" and that "he was holding the straps so the hooks wouldn't come loose and he gave me a heads up and down." The plaintiff's expert likewise corroborated that the hooks without safety latches, which violated OSHA and industry standards, required Bommarito to stay close and put tension on the lines.

Differing testimony from witnesses or experts does not mean the district court's proximate cause determination was clearly erroneous.

> Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous .... The court owes even greater deference to findings based on the credibility of witnesses and must uphold them if based on coherent, internally consistent, and facially plausible testimony that is not contradicted by external evidence.[14]

Here, the hook, one of the appurtenances of the vessel, was defective—it lacked a safety latch. The hook was both the but-for and the

---

[14] *Bertucci Contracting Corp. v. M/V ANTWERPEN*, 465 F.3d 254, 258-59 (5th Cir. 2006) (first quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985), then citing *Anderson*, 470 U.S. at 575).

proximate cause of the accident:[15] if the hook was not defective, Bommarito would not have been standing so close by to hold the crane lines and keep the hook from slipping out. The hook is the very piece of equipment that struck Bommarito, causing him to fall and sustain his injuries. There were enough facts in the record to support the district court's conclusion that the reason Bommarito was standing so close was because of the defective hook design. Accordingly, subject-matter jurisdiction exists under the AEA.

## III

Belle Chasse challenges the district court's determination that Land and Marine "have fused and are in reality the same company." This is a mixed question of fact and law where "the tribunal below is 'immerse[d]' in facts and compelled to 'marshal and weigh evidence' and 'make credibility judgments' . . . ."[16] This court can reverse only "if the findings are based on a misunderstanding of the law or a clearly erroneous view of the facts."[17]

"It is well-settled that the invocation of federal admiralty jurisdiction results in the application of federal admiralty law rather than state law."[18] Because we have determined that our admiralty jurisdiction has been

---

[15] *Scarborough v. Clemco Indus.*, 391 F.3d 660, 664 (5th Cir. 2004) (explaining that the defective appurtenance must be the proximate cause and not just one but-for cause of the injury).

[16] *Bufkin v. Collins*, 604 U.S. 369, 382 (2025) (quoting *U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Village at Lakeridge, LLC*, 583 U.S. 387, 396 (2018)).

[17] *Bertucci Contracting Corp. v. M/V ANTWERPEN*, 465 F.3d 254, 259 (5th Cir. 2006) (quoting *Tokio Marine & Fire Ins. Co. v. FLORA MV*, 235 F.3d 963, 966 (5th Cir. 2001)).

[18] *State of La. ex rel. Guste v. M/V TESTBANK*, 752 F.2d 1019, 1031-32 (5th Cir. 1985).

invoked, we apply federal common law to the veil-piercing analysis.[19] "The prerequisites for piercing a corporate veil are as clear in federal maritime law as in shoreside law . . . ."[20] The plaintiff must show either that an alter ego was used to perpetrate a fraud, or that it primarily transacted another entity's business rather than its own corporate business.[21] Courts may look to a "laundry list of factors"[22] when making this determination, including whether:

(1) the parent and the subsidiary have common stock ownership;

(2) the parent and the subsidiary have common directors or officers;

(3) the parent and the subsidiary have common business departments;

(4) the parent and the subsidiary file consolidated financial statements and tax returns;

(5) the parent finances the subsidiary;

(6) the parent caused the incorporation of the subsidiary;

(7) the subsidiary operates with grossly inadequate capital;

---

[19] *See Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287, 1294 (9th Cir. 1997) ("Federal courts sitting in admiralty generally apply federal common law when examining corporate identity."); *see also Blue Whale Corp. v. Grand China Shipping Dev. Co.*, 722 F.3d 488, 497 (2d Cir. 2013) (stating that, while federal common law will not *always* govern the veil-piercing analysis in admiralty, "[w]hen the choice is between state law and federal common law, the federal interest in maintaining uniformity in the quintessentially federal realm of admiralty supersedes any competing interest in applying state law.").

[20] *Kirno Hill Corp. v. Holt*, 618 F.2d 982, 985 (2d Cir. 1980).

[21] *Id.*

[22] *United States v. Jon-T Chemicals, Inc.*, 768 F.2d 686, 691 (5th Cir. 1985).

(8) the parent pays the salaries and other expenses of the subsidiary;

(9) the subsidiary receives no business except that given to it by the parent;

(10) the parent uses the subsidiary's property as its own;

(11) the daily operations of the two corporations are not kept separate; and

(12) the subsidiary does not observe the basic corporate formalities, such as keeping separate books and records and holding shareholder and board meetings.[23]

Land is a wholly-owned subsidiary of Marine. The two companies share a single liability insurance policy, a single workers' compensation insurance policy, a human resources department, and officers (including Shawn Konrad, who is an officer of and paid by Marine but supervises Land, and Gordan Konrad who is a manager and director of both companies and who testified as corporate representative of both). Mr. Bommarito and Mr. Clulee were identified in their employment paperwork occasionally as employees of Land and occasionally as employees of Marine. Land only provides services for Marine and does not have any income; when payments come due, Marine deposits the necessary amount into Land's account. The OC160 is owned by Marine but maintained and used by Land without any written agreement between the companies. Marine could at any time take control of the OC160 while Land was using it.

On this record, it was not clearly erroneous for the district court to determine that Land and Marine are, in substance, the same company.

---

[23] *Id.* at 691-692 (citing *Nelson v. Int'l Paint Co.*, 734 F.2d 1084, 1093 (5th Cir. 1984)).

No. 22-30382

## IV

We turn to the issue of causation of Bommarito's death. "Because this case was decided by the district court without a jury, we review the district court's factual findings for clear error."[24]  Specifically, "[i]n an admiralty case tried before a court without a jury, the district court's findings of negligence, cause-in-fact, and proximate cause are treated as factual findings subject to the clearly erroneous standard."[25]  Legal conclusions are reviewed de novo.[26]

"[T]he common law negligence doctrines of proximate causation and superseding cause apply in admiralty . . . ."[27]  "The superseding cause doctrine applies where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable."[28]  Whether an overdose from illegal drugs is a superseding cause is an issue of first

---

[24] *Bertucci Contracting Corp. v. M/V ANTWERPEN*, 465 F.3d 254, 258 (5th Cir. 2006).

[25] *Id.* at 259 (citing *In re Luhr Bros., Inc.*, 325 F.3d 681, 684 (5th Cir. 2003)); *see also Rivera v. Kirby Offshore Marine, L.L.C.*, 983 F.3d 811, 816 (5th Cir. 2020) ("'We review legal conclusions and mixed questions of law and fact following a bench trial de novo.'  The district court's factual findings are binding unless clearly erroneous.  'Questions concerning the existence of negligence and causation are treated as factual issues subject to the clearly erroneous standard.'" (quoting *In re Luhr Bros.*, 325 F.3d at 684)).

[26] *Scarborough v. Clemco Indus.*, 391 F.3d 660, 663 (5th Cir. 2004) (citing *Vais Arms, Inc. v. Vais*, 383 F.3d 287, 291 (5th Cir. 2004)).

[27] *Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM*, 447 F.3d 360, 367 (5th Cir. 2006) (citing *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 836-39 (1996)).

[28] *Id.* at 367-68.

13

impression in our circuit, and one that few federal courts have addressed.[29] We are permitted to "draw guidance" from state law:

> In ruling upon whether a defendant's blameworthy act was sufficiently related to the resulting harm to warrant imposing liability for that harm on the defendant, courts sitting in admiralty may draw guidance from, *inter alia,* the extensive body of state law applying proximate causation requirements and from treatises and other scholarly sources.[30]

We find persuasive state cases that have concluded ingesting illegal drugs to be a superseding cause.[31] Our own precedent recognizes that the

---

[29] *See Phelps v. Delphi Behav. Health Grp., LLC*, No. 19-61557-CIV-SINGHAL/VALLE, 2023 WL 2069791, at *3 (S.D. Fla. Jan. 17, 2023), *aff'd,* No. 23-10476, 2024 WL 2290019 (11th Cir. May 21, 2024) ("The overdoses were caused by each Plaintiff's voluntary decision to consume drugs in a manner that violated any physician instructions they had received. That voluntary decision, of each Plaintiff, is itself an intervening cause that breaks the chain of proximate causation. A voluntary decision to consume a large amount of drugs is not a 'direct, natural and continuous sequel to the initial act,' but an act 'independent of and not set in motion by the initial wrong.' . . . For these reasons, the Court finds no reasonable jury could conclude Defendant's alleged negligence in operating a vehicle proximately caused Plaintiffs' overdose deaths." (quoting *Ruiz v. Tenet Hialeah Healthsystem, Inc.*, 260 So. 3d 977, 982 (Fla. 2018))); *cf. Thompson v. State Farm Mut. Auto. Ins. Co.*, 789 F. App'x 90, 94 (10th Cir. 2019) (concluding based on Colorado law that whether a car accident was the proximate cause of death six months later from an overdose of prescription drugs presented a fact question to be resolved by a jury).

[30] *Sofec, Inc.*, 517 U.S. at 839.

[31] *See Vance v. Trimble*, 688 N.E.2d 1049, 1052 (Ohio 1996) ("In the instant case, Vance took the overdose of Darvocet of his own volition; there is absolutely no evidence to suggest otherwise . . . . Vance ignored the recommended dosage; such misuse of an otherwise effective pain reliever proved fatal by his own intentional act. We cannot find that there is any genuine issue as to whether Vance acted voluntarily by overdosing on Darvocet."); *Williams v. White Castle Sys., Inc.*, 173 S.W.3d 231, 236 (Ky. 2005) ("There was medical evidence that the drugs that were prescribed for the effects of the back injury would not have caused Williams' death if taken as directed and evidence that taking Demerol in addition to the prescribed medications caused Williams' respiratory failure and ultimately his death. There was also evidence from which the ALJ could reasonably conclude that no physician prescribed or administered Demerol for the effects of the

No. 22-30382

superseding cause doctrine "is predicated on the notion that 'there must be a terminus somewhere, short of eternity, at which the second party becomes responsible in lieu of the first.'"[32]   Foreseeability is a continuum; at some point, there is no causation as a matter of law.

Here, Bommarito died from an overdose of fentanyl mixed with Xylazine.  At that point in time, Bommarito did not have an active prescription for fentanyl.  Xylazine is a horse tranquilizer that is not available for human use, and it is undisputed that the "fentanyl was purchased on the street."  Bommarito died from ingesting over six times what is considered a lethal dose of fentanyl.  Under the facts and circumstances of this case, the cause of Bommarito's death was ingestion of the drugs found in his system.  That was not traceable to the liability of Belle Chasse Marine for the injuries he sustained while working, even if he continued to experience pain from his work-related injuries.  It was not reasonably foreseeable to Belle Chasse, who

---

claimant's back injury.  Under the circumstances, there was substantial evidence that Williams' death was not due to the effects of his work-related injury." (citing *Special Fund v. Francis*, 708 S.W.2d 641, 643 (Ky. 1986))); *In re Death of Sade*, 649 P.2d 538, 540-41 (1982) ("The prescription specified one tablet four times a day. Decedent disregarded the medical directions accompanying that medication, and apparently did so intentionally (although while in a state of inebriation).  He had previously expressed the same desire. Given this state of the record it is clear the trial court had sufficient competent evidence and could, therefrom, draw the reasonable inference that the cause of death was not a legitimate consequence flowing from a compensable injury, but was in fact a consequence of a separate and distinct volitional act of decedent."); *Sapko v. Connecticut*, 44 A.3d 827, 844 (2012) (holding that the commissioner's "determination that the decedent's ingestion of excessive quantities of Oxycodone and Seroquel constituted an intervening event that broke the chain of causation, was supported by the evidence and was not contrary to law. The commissioner expressly credited the testimony of Bayer, who stated that the level of Oxycodone in the decedent's system was twenty times higher than the therapeutic dosage and that the elevated level of Oxycodone likely would not have been fatal if the decedent had not simultaneously overdosed on Seroquel.").

[32] *Stolt Achievement, Ltd.*, 447 F.3d at 369 (quoting *In re Kinsman Transit Co.*, 338 F.2d 708, 722 (2d Cir. 1964)).

No. 22-30382

caused Bommarito's original injury, that he would ingest illegal drugs which proved to be lethal. We therefore conclude that Bommarito's ingestion of illegal drugs was a superseding cause of his death.

## V

Belle Chasse challenges the award of damages for loss of consortium to Susan Bommarito, as a non-dependent parent, resulting from the wrongful death of her son. Because we conclude that Belle Chasse is not liable for Bommarito's death, Susan Bommarito is not entitled to wrongful death damages. In any event, "[w]hether damages for loss of consortium are recoverable is a legal question, subject to de novo review."[33] Neither party disputes that this is a territorial waters case rather than a high seas case. Non-dependent parents of a longshoreman who dies in territorial waters are not entitled to recover damages for loss of society stemming from that death.[34]

\* \* \*

For the foregoing reasons, we REVERSE the award of damages for wrongful death to all plaintiffs and loss of consortium to Susan Bommarito and REMAND for further proceedings consistent with this opinion.

---

[33] *Moore v. M/V ANGELA*, 353 F.3d 376, 383 (5th Cir. 2003) (italics removed) (citing *Michel v. Total Transp., Inc.*, 957 F.2d 186, 191 (5th Cir. 1992)).

[34] *In re Am. River Transport*, 490 F.3d 351, 360 (5th Cir. 2007).

No. 22-30382

HAYNES, *Circuit Judge*, dissenting in part:

I concur with sections I-III of the majority opinion, and I agree with vacating Susan Bommarito's loss of consortium award but for the reason that she is a non-dependent parent. I respectfully dissent from the reversal of the district court's award of damages for wrongful death based on the majority opinion's decision that Bommarito's death was due to a superseding cause.

It is important to note that the decision made by the District Court was based upon factual findings which requires us to affirm unless there is clear error. The district court's determination that Bommarito's overdose was not a "separate, intervening cause of his death, but rather was a direct consequence of his injuries from the accident and the pain those injuries caused him" is not clear error. This court reviews for clear error and "[i]f the district court's finding is plausible in light of the record viewed as a whole, the court of appeals cannot reverse even though, if sitting as the trier of fact, it would have weighed the evidence differently." *Bertucci Contracting Corp. v. M/V Antwerpen*, 465 F.3d 254, 258 (5th Cir. 2006). "In an admiralty case tried before a court without a jury, the district court's findings of negligence, cause-in-fact, and proximate cause are treated as factual findings subject to the clearly erroneous standard." *Id.*

Turning to the merits, an intervening act is not a superseding cause if the original actor should have realized a person might so act, a reasonable person would not consider it highly extraordinary that the person acted in such a way, or if the intervening act is a normal consequence of the situation created by the original actor. *Becker v. Tidewater, Inc.*, 586 F.3d 358, 372 (5th Cir. 2009) (applying the Restatement (Second) of Torts § 447 (A.L.I. 1965)). The touchstone of this inquiry is foreseeability. *Gracyalny v. Westinghouse Elec. Corp.*, 723 F.2d 1311, 1323 (7th Cir. 1983). Indeed, a defense witness

17

testified that it was common for people in a situation such as Bommarito who was suffering to take fentanyl to address the injuries.

In this case, he was not randomly taking fentanyl but, instead, as the district court stated, "[t]he evidence at trial showed that Mr. Bommarito took the drugs that caused his fatal overdose only to cope with the intractable pain from his injuries after he ran out of prescription opioid painkillers, which his doctors had prescribed only for a limited time." The evidence supported that Bommarito had never used illegal drugs before; he passed all his drug tests; and the pathologist who performed his autopsy testified Bommarito's overdose could have happened from taking fentanyl once and that she "has seen many cases where people with chronic pain who had been prescribed opioid painkillers, like Mr. Bommarito, later sought fentanyl to deal with their pain and suffered overdoses shortly thereafter." He only took it because he had no other assistance for his pain. Thus, it is not a superseding act as he never would have done this had he not had the original injury. Accordingly, whether or not we would have ruled the same on the facts, I do not see any clear error, so I conclude that we should affirm on this.

Accordingly, I respectfully dissent on the reversal as to the award of damages for wrongful death to the plaintiffs.